# EXHIBIT 1

Joshua B. Swigart (SBN 225557)
Josh@SwigartLawGroup.com
**SWIGART LAW GROUP, APC**
2221 Camino del Rio S, Ste 308
San Diego, CA 92108
P: 866-219-3343
F: 866-219-8344

[Additional Counsel on Signature Page]
*Attorneys for Plaintiff David Greenly and The Putative Class*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID GREENLEY, individually and on behalf of others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>Kochava, Inc.,<br><br>Defendant. | CASE NO: 22-CV-01327 BAS-AHG<br><br>FIRST AMENDED CLASS ACTION COMPLAINT<br><br>1. INVASION OF PRIVACY;<br>2. VIOLATION OF THE CALIFORNIA COMPUTER DATA ACCESS AND FRAUD ACT, CALIFORNIA PENAL CODE § 502;<br>3. VIOLATION OF CALIFORNIA PENAL CODE § 631;<br>4. VIOLATION OF CALIFORNIA PENAL CODE § 632;<br>5. VIOLATION OF CALIFORNIA PENAL CODE § 632.7;<br>6. UNFAIR VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW, CAL. BUS. & PROF. CODE § 17500, *ET SEQ.*;<br>7. UNLAWFUL VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW, CAL. BUs. & PROF. CODE § 17500, *ET SEQ.*;<br>8. UNJUST ENRICHMENT<br><br>JURY TRIAL DEMANDED |

1.    David Greenley ("Plaintiff"), individually and on behalf of all other similarly situated California residents ("Class Members"), brings this action for damages and injunctive relief against Kochava, Inc. ("Defendant"), and its present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, related entities for violations of the California Constitution, Article I, Section 1; the California Computer Data Access and Fraud Act ("CDAFA"), California Penal Code § 502; the California Invasion of Privacy Act ("CIPA"), California Penal Code § 630, *et seq.*, including Sections 631, 632, and 632.7; violation of the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17500, *et seq.*; and for Defendant's unjust enrichment, in relation to the unauthorized collection, recording, and dissemination of Plaintiff's and Class members' personal information, geolocation data, and communication. Plaintiff makes these allegations on information and belief, with the exception of those allegations that pertain to Plaintiff, or to Plaintiff's counsel, which Plaintiff alleges on his personal knowledge.

## NATURE OF THE CASE

2.    The efforts of privacy-conscious individuals to avoid the improper collection and storage of personal information—particularly sensitive personal information—must be protected. As the Supreme Court recognized in *Carpenter v. United States*, 138 S. Ct. 2206 (2018), location data is highly sensitive, not just because of what the data point alone says about an individual (*i.e.*, where they were at a particular time), but also because of the massive amount of personal information that can be extracted from location data (such as medical treatment, personal relationships, and private interests). As Chief Justice John Roberts stated, "a cell phone—almost a 'feature of human anatomy[]'—tracks nearly exactly the movements of its owner. . . . A cell phone faithfully follows its owner beyond public thoroughfares and into private residences, doctor's offices, political headquarters, and other potentially revealing locales," and when a third-party has access to the information stored on one's cell

First Amended Class Action Complaint                                    22-CV-01327 BAS-AHG

phone, that entity "achieves near perfect surveillance, as if it had attached an ankle monitor to the phone's user." *Id*. at 2218 (internal citations omitted).

3.      Kochava collects a wealth of information about consumers and their mobile devices by, among other means, purchasing data from other data brokers to sell to its own customers, and by intercepting location data consumers provide to mobile-phone applications that have incorporated Kochava's software developer kit (SDK).

4.      App developers often use SDKs because the kits minimize development work and create a predictable stream of income that grows as more people use the app.

5.      App developers embed SDKs into their app that, and may not know the full extent and functions of the code in the SDK. Some SDKs, unbeknownst to consumers, siphon consumers' location data directly to a data broker or advertising platform, and can even include the ability to track users' locations through public Bluetooth beacons, which enable fine-grained tracking indoors.

6.      Data brokers, such as Kochava, provide SDK to app developers to assist them in developing their apps. But in exchange for doing so, they permit data brokers like Kochava to surreptitiously intercept location data they then use to profit at the expense of consumers.

7.      Kochava does so by selling customized data feeds to its clients to, among other purposes, assist in advertising and analyzing foot traffic at stores or other locations. Among other categories, Kochava sells timestamped latitude and longitude coordinates showing the location of mobile devices.

8.      Because the data is associated with particular device IDs, disaggregated data—such as location and other data that Kochava surreptitiously collects—, is later repackaged and sold to third parties by Kochava, without consumers' consent, and can be easily de-anonymized.

9.      In 2013, researchers published in *Scientific Journal* a study concerning their analysis of 15 months of human mobility data like that collected and sold by Kochava. They concluded that even absent an "obvious identifier" like a name,

3

addresses or a device ID, "if an individual's patterns are unique enough, outside information can be used to link the data back to an individual" and "that the uniqueness of human mobility traces is high and that mobility datasets are likely to be re-identifiable using information only on a few outside locations."

10.    In other words, even data that lacks an identifier particular to a given individual can be de-anonymized with minimal effort. The device-specific location data Kochava collects and sells without consumers' consent thus poses **even greater** risks to consumers themselves because it is not anonymized and can be combined with various unique mobile device identifiers, to identify the mobile device's user or owner.

11.    As the FTC explains in a parallel enforcement action it recently initiated against Kochava, "precise geolocation data associated with MAIDs, such as the data sold by Kochava, may be used to track consumers to sensitive locations, including places of religious worship, places that may be used to infer an LGBTQ+ identification, domestic abuse shelters, medical facilities, and welfare and homeless shelters. For example, by plotting the latitude and longitude coordinates included in the Kochava data stream using publicly available map programs, it is possible to identify which consumers' mobile devices visited reproductive health clinics. Further, because each set of coordinates is time-stamped, it is also possible to identify when a mobile device visited the location. Similar methods may be used to trace consumers' visits to other sensitive locations."

12.    The FTC's concerns regarding disaggregated location data are not mere hyperbole; they are concrete and particularized, as are the risks the surreptitious collection and sale of location data poses to consumers.

13.    For example, in 2018, *The New York Times* was able to use purportedly "anonymous" location data to follow multiple people into abortion clinics, follow them inside and unmask them. The article's authors reviewed a database of data collected by

1   one app data collector, and determined that the data revealed locations that individuals'

2   visited to within a few yards.[1]

3       14.     Likewise, *The Pillar*, a Catholic Substack publication, successfully outed

4   a homosexual priest using location data purchased from a data broker like Kochava.

5   Although the data was not associated with names or particular addresses, investigators

6   isolated location data from a dating app, Grindr, showing that the device frequently was

7   found at the priest's residence. By cross-referencing that device ID with other locations

8   known to be frequented by the priest, investigators were able to confirm the device ID

9   was associated with the priest, and that his mobile device frequently visited gay bars

10  and private residences associated with other Grindr users.[2]

11      15.     Mobile device data, such as the kind that Kochava surreptitiously collects

12  from consumers, can be used to identify specific individuals—even without information

13  such as the person's name or address—and determine specific locations that the

14  individual visited, all without informing or obtaining consent from the person tracked.

15  **CALIFORNIA VIGOROUSLY PROTECTS INDIVIDUALS' PRIVACY**

16      16.     The California Constitution recognizes the right to privacy inherent in all

17  residents of the State and creates a private right of action against private entities that

18  invade that right.

19      17.     Article I, Section 1 of the California Constitution provides: "All people are

20  by nature free and independent and have inalienable rights. Among these are enjoying

21  and defending life and liberty, acquiring, possessing, and protecting property, and

22  pursuing and obtaining safety, happiness, and privacy."

23

24

25  ---

    [1] Jennifer Valentino-DeVries et al, *Your Apps Know Where You Were Last Night, and They're Not Keeping it Secret*, New York Times (Dec. 10, 2018), available at:

26  https://www.nytimes.com/interactive/2018/12/10/business/location-data-privacy-

27  apps.html?mtrref=www.vice.com&gwh=3919FC4278D0708838A67ACD4CF87224&gwt=pay&assetType=PAYWALL.

    [2] Joseph Cox, *The Inevitable Weaponization of App Data is Here*, Vice (July 21, 2021), available at:

28  https://www.vice.com/en/article/pkbxp8/grindr-location-data-priest-weaponization-app.

First Amended Class Action Complaint                              22-CV-01327 BAS-AHG

18.     The right to privacy was added to the California Constitution in 1972, through Proposition 11 (called the "Right to Privacy Initiative"). Proposition 11 was designed to codify the right to privacy, protecting individuals from invasions of privacy from both the government and private entities alike: "The right of privacy is the right to be left alone. It is a fundamental and compelling interest. . . . It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us. Fundamental to our privacy is the ability to control circulation of personal information." Ballot Pamp., Proposed Stats. and Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972), argument in favor of Prop. 11, p. 27; *see also Hill v. Colorado*, 530 U.S. 703, 716 (2000) (the right to privacy includes right to be free in one's home from unwanted communication); *Hill v. National Collegiate Athletic Assn.*, (1994) 7 Cal.4th 1, 81, (Mosk, J., dissenting).

19.     The California State Legislature passed CIPA in 1967 to protect the right of privacy of the people of California.

20.     The California legislature was motivated to enact CIPA by a concern that the "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

21.     The California State Legislature passed CIPA in 1967 to protect the right of privacy of the people of California, replacing prior laws, which permitted the recording of telephone conversations with the consent of one party to the conversation. The California Penal Code is very clear in its prohibition against unauthorized recording without the consent of the other person to the conversation: "Every person who, intentionally and without the consent of all parties to a confidential communication, by

First Amended Class Action Complaint                                    22-CV-01327 BAS-AHG

means of any electronic amplifying or recording device, eavesdrops upon or records the confidential communication [violates this section]." Penal Code § 632(a).

22. The California Penal Code is very clear in its prohibition against unauthorized tapping or connection without the consent of the other person: "Any person who, by means of any machine, instrument, or contrivance, or any other matter, intentionally taps, or makes any unauthorized connection . . . with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable. Or instrument of any internal telephonic communication system, or who willfully and without consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state [violates this section]." Penal Code § 631(a).

23. Defendant made an unauthorized connection with Plaintiff's and Class members' mobile devices when Defendant collected and stored their personal information, geolocation data specific to each consumer's mobile device, and communications, and then provided such information to its clients for the purposes of targeted advertising.

24. Defendant collected, sold, licensed, and transferred Plaintiff's and Class members' precise geolocation data which were associated to visits to sensitive locations without Plaintiff's and Class members' knowledge or consent. These actions cause or are likely to cause substantial injury to Plaintiff and Class members which are not outweighed by any benefits to the consumer or competition.

25. Plaintiff brings this action for violations of Plaintiff's and Class members' right to privacy, both under common law and under the California Constitution; CDAFA; and for every violation of California Penal Code § 631, which provides for statutory damages of $2,500 for each violation, pursuant to California Penal Code § 631(a); Penal Code § 632, which provides for statutory damages of $5,000 for each violation under Penal Code § 637.2; violations of the UCL; and for unjust enrichment.

7

26.     Plaintiff brings this class action on behalf of a class, as more fully defined infra, consisting of the Confidential Communication class.

27.     Unless otherwise stated, all the conduct engaged in by Defendant took place in California.

28.     All violations by Defendant were knowing, willful, and intentional, and Defendant did not maintain procedures reasonably adapted to avoid any such violation.

29.     Unless otherwise indicated, the use of Defendant's name in this Complaint includes all agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and insurers of the named Defendant.

### JURISDICTION & VENUE

30.     Jurisdiction is proper under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2), because Plaintiff, a resident of the State of California, seeks relief on behalf of a California class, which will result in at least one class member belonging to a different state than that of Defendant, a Delaware Corporation with its principal place of business in Idaho.

31.     Plaintiff is requesting damages, including statutory damages of $2,500 per violation of Cal. Penal Code §631, $5,000 per violation of §632 under §637.2, which, when aggregated among a proposed class number in the tens of thousands, exceeds the $5,000,000 threshold for federal court jurisdiction under CAFA.

32.     Therefore, both diversity jurisdiction and the damages threshold under CAFA are present, and this Court has jurisdiction.

33.     Because Defendant conducts business within the State of California, personal jurisdiction is established.

34.     Venue is proper pursuant to 28 U.S.C. § 1391 for the following reasons: (i) the conduct complained of herein occurred within this judicial district; and (ii) Defendant conducted business within this judicial district at all times relevant.

Case 3:23-cv-01327-BAS-AHG Document 20-1 Filed 02/23/24 PageID.96 of 113 Page 5

## PARTIES

35.    Plaintiff is, and at all times mentioned herein was, a natural person and resident of the State of California who regularly visits and conducts business in the County of San Diego.

36.    Plaintiff owns, carries, and regularly uses a cellular device that contains Defendant's Kochava monitoring and intercepting SDK software.

37.    Plaintiff owns a mobile cellular telephone phone that use application(s) containing the Defendant's software development kit (SDK).

38.    Plaintiff regularly uses his cell phone to access these application(s) in which Defendant utilizes its embedded SDK to track his geolocation, and to monitor and intercept communications related to his personal characteristics, mode of living, purchase decisions, personal choices, app selections, spending habits, and click choices, amongst others.

39.    Plaintiff values his privacy, as most people do. Even though Plaintiff turned the location tracking off on his mobile device, Defendant's SDK nevertheless continued to track his movements, monitor his application selections, choices and uses, and combined that valuable private information with other data sets to sell to third-parties for advertising, sales, and marketing purposes against his wishes.

40.    Plaintiff did not know until recently that his purchase decisions, his movements, and his locations, were being tracked by Defendant to market, sell, and advertise to him.

41.    Defendant is, and at all times mentioned herein was, a Delaware corporation with its principal place of business located at 201 Church Street, Standpoint, Idaho.

42.    Defendant has registered an agent of process with the Idaho Secretary of State, Doug Lieuallen, 201 Church Street, Sandpoint, Idaho 83864. Plaintiff alleges that at all times relevant herein Defendant conducted business in the State of California, in the County of San Diego, within this judicial district.

9

## FACTUAL ALLEGATIONS

## **Defendant Sells Precise Location Information**

## **for Millions of Mobile Devices**

43.    On August 29, 2022, the Federal Trade Commission filed a federal lawsuit against Defendant for its market conduct in illegally gathering geo-location data ("FTC Complaint").

44.    The following factual summary includes facts obtained from the FTC Complaint; the Defendant's statements on its own website, and various other reliable public sources of information describing Defendant's data gathering business practices.

45.    Defendant is, among other things, a location data broker that provides its customers massive amounts of precise geolocation data collected from consumer's mobile devices.

46.    Defendant collects a wealth of information about consumers and their mobile devices by, among other means, purchasing data from other data brokers to sell to its own customers.

47.    Defendant then sells customized data feeds to its clients to assist in advertising and analyzing foot traffic at stores or other locations. Defendant sells timestamped latitude and longitude coordinates showing the location of mobile devices.

48.    As noted in Defendant's explanation, each pair or timestamped latitude and longitude coordinates is associated with a "device_id_value," which is also known as a Mobile Advertising ID ("MAID"). A MAID is a unique identifier assigned to a consumer's mobile device to assist marketers in advertising to the consumer. Although a MAID may be changed by a consumer, doing so requires the consumer to proactively reset the MAID on the consumer's mobile device.

49.    In describing its product in the online marketplace, Defendant has asserted that it offers "rich geo data spanning billions of devices globally." Defendant further claimed that its location data feed "delivers raw latitude/longitude data with volumes around 94[billion]+ geo transactions per month, 125 million monthly active users, and

35 million daily users, on average observing more than 90 daily transactions per device."

**Defendant Provides Public Access to Plaintiff**

**and Class Members' Location Data**

50.     According to the FTC Complaint, Defendant has sold access to its data feeds on online data marketplaces that are publicly accessible. Defendant typically charges a monthly subscription fee of thousands of dollars to access its location data feed but has also offered a free sample (the "Kochava Data Sample").

51.     Defendant has made the Kochava Data Sample publicly available with only minimal steps and no restrictions on usage.

52.     For example, according to the FTC the Kochava Data Sample was available on the Amazon Marketplace until approximately June 2022. In order to access the sample data feed, a purchaser simply needed a free AWS account. A purchaser would then search the AWS marketplace for "Kochava," which resulted in two available datasets – a $25,000 location data feed subscription and the free Kochava Data Sample.

53.     The Kochava Data Sample consisted of a subset of the paid data feed, covering a rolling seven-day period. It was formatted as a text file, which could be converted into a spreadsheet, which contained over 327,480,000 rows and 11 columns of data, corresponding to over 61,803,400 unique mobile devices.

54.     The FTC Complaint further explained that when an AWS purchaser clicked "subscribe" for the Kochava Data Sample feed, the purchaser was directed to a screen that included a "Subscription terms" notification that stated the Kochava Data Sample "has been marked by the provider [*i.e.*, Kochava] as containing sensitive categories of information."

55.     Below this notice, a form was displayed, requesting the purchaser's company name, name of purchaser, email address, and intended use case.

First Amended Class Action Complaint                                      22-CV-01327 BAS-AHG

56. A purchaser could use an ordinary personal email address and describe the intended use simply as "business." The request would then be sent to Defendant for approval. Defendant has approved such requests in as little as 24 hours.

57. Once Defendant approved the request, the purchaser was notified by email and then gained access to the data, along with a data dictionary explaining the categories of data provided as detailed within the FTC Complaint.

58. The Kochava Data Sample included precise location data gathered in the seven days prior to the date Defendant approved the subscription request.

## **Defendant's Data Practices and Business Model**

59. Defendant gathers and tracks specific consumer geolocation and other data about consumers, then combines it with other consumer data to create consumer reporting about individual consumers by tracking their mobile phone location and corresponding smartphone application and click-thru activity and usage.

60. According to Defendant's own website, "Kochava is the industry standard for secure, real-time data solutions. We help people-based marketers establish identity, define and activate audiences, and measure and optimize their marketing across connected devices." https://www.kochava.com/company, last accessed November 18, 2022.

61. Defendant also states that,

> Kochava Inc. is a real-time data solutions company offering the leading omni-channel measurement and attribution solutions for data-driven marketers. The Marketers Operating System™ (m/OS) from Kochava empowers advertisers and publishers with a platform that seamlessly integrates and manages customer identity, measurement, and data controls. Unlike the complicated, siloed tech stacks employed today, the m/OS takes the next step: unifying all of your data and critical omni-channel solutions into a cohesive, operational system that goes beyond data aggregation and reporting. The m/OS provides the foundation for limitless advertiser and publisher tools, including the option to build third-party solutions onto the platform. By

design, m/OS facilitates success by making data accessible and actionable to maximize ROI.

https://www.kochava.com/kochava-announces-clue-as-newest-authorized-agency-partner, last accessed November 18, 2022.

62.   Defendant's LinkedIn page touts that:

Kochava delivers what marketers need, when they need it, to establish customer identity and segment and activate audiences in a privacy-first world, leveraging data from the Kochava Collective for audience enrichment.

https://www.linkedin.com/company/kochava, last accessed November 18, 2022.

63.   Defendant lists its business sector specialties as, "Mobile Advertising Solutions, Mobile Tracking, Analytics, Mobile Gamification, Attribution for Connected Devices, Monetization, Mobile App Tracking, and App Analytics." *Id.*

64.   According to its CEO, Charles Manning, Defendant

Kochava offers a unique, holistic and unbiased approach to **mobile attribution analytics** and optimization. Via its platform, Kochava provides mobile advertisers with precise real-time visualization of campaign data that spans from initial launch through conversion and lifetime value (LTV) reporting, including comprehensive post-install event tracking. Kochava's tools enable customers to turn their data into actionable information. With over 3,000 publisher and network integrations including Facebook, Twitter, Google, Snap, Pinterest and Pandora, Kochava is trusted globally by the largest brands in mobile gaming, commerce, news and media. For more information visit www.kochava.com.

https://www.linkedin.com/in/charlesfmanning, last accessed November 18, 2022 (bold underline added).

65.   Defendant describes in detail its process of using multiple distinct identifiers in order to attribute consumer decisions to advertisement strategies using mobile analytics:

First Amended Class Action Complaint                                        22-CV-01327 BAS-AHG

**[Kochava's] Attribution Overview**

**FEATURE SUMMARY:** What is attribution and why do you need it? Attribution is the act of assigning credit to the advertising source that most strongly influenced a conversion (e.g. app install). It is important to know where your users are discovering your app when making future marketing decisions.

The Kochava attribution engine is comprehensive, authoritative and actionable. The system considers all possible factors and then separates the winning click from the influencers in real-time. The primary elements of engagement are impressions, clicks, installs and events. Each element has specific criteria which are then weighed to separate winning engagements from influencing engagements.

**Engagements**
Kochava collects (via momentary redirect or network server ping) device information when an impression is served or a user clicks on an advertisement served by a network. Each of these engagements are eligible for attribution. This collected device information ranges from unique device identifiers to the IP address of the device at the time of click or impression, dependent upon the capabilities of the network.

Kochava has thousands of unique integrations. Through the integration process, we have established which device identifiers and parameters each network is capable of passing on impression and/or click. The more device identifiers that a network can pass, the more data is available to Kochava for reconciling clicks to installs. When no device identifiers are provided, Kochava's robust fingerprinting logic is employed which relies upon IP address and device user agent. The integrity of a fingerprint match is lower than a device-based match, yet still results in over 90% accuracy.

The Kochava system also determines whether a device has previously engaged with an advertisement. When multiple engagements of the same type occur, they are identified as duplicates to provide advertisers with more insight into the nature of their traffic.

Kochava tracks every engagement with every ad served, which sets the stage for a comprehensive and authoritative reconciliation process.

*//*

14

**Installs**

Once the app is installed and launched, Kochava receives an install ping (either from the Kochava SDK within the app, or from the advertiser's server via Server-to-Server integration). The install ping includes device identifiers as well as IP address and the user agent of the device. The data received on install is then used to find all matching engagements based on the advertiser's settings within the Postback Configuration and deduplicated. For more information on campaign testing and device deduplication, refer to our Testing a Campaign support document.

**Events**

The advertiser has complete control over the implementation of tracking events within the app. In the case of reconciliation, the advertiser has the ability to specify which post-install event(s) define the conversion point for a given campaign. The lookback window for event attribution within a reengagement campaign can be refined within the Tracker Override Settings. If no reengagement campaign exists, all events will be attributed to the source of the acquisition, whether attributed or unattributed (organic).

https://support.kochava.com/reference-information/attribution-overview, last accessed November 18, 2022.

66.     One individual in the mobile analytics industry described the methodology and significance of mobile attribution analytics like those employed by Defendant:

> Attribution is how marketers understand the journey you take to arrive in their app and what you do once you've landed there. When done right, there's a data point for each of the actions a user takes on the journey, from clicking an ad to making a purchase.
>
> …
>
> **How does mobile attribution work?**
> So why is it important to run with an attribution provider and not just rely on something like Google Analytics? The most important reason is that implementing a mobile app tracking SDK enables you to make well-informed business decisions in real time. An attribution provider gives you a platform to

First Amended Class Action Complaint                                    22-CV-01327 BAS-AHG

discover where your users come from - if they arrived in your app via a video ad, for instance. We're then able to help you understand how that user moves through your app and how you can compare their journey to someone else who arrived via a different source.

This lets you determine which are your best-performing campaigns, so you can pinpoint the most effective ads and iterate on them. With this information, you're able to optimize your creative assets and use hard data to get rid of failing ads and tweak the good ones. Greater knowledge about how your ads perform allows you to practice smart retargeting and build campaigns targeted. For example, you could specifically target users who tried out your app but didn't stick around.

Your users will come from multiple advertising channels. If you cannot track the how, who, when and why of their journey to your app, you cannot know which of your networks are delivering users, the relative value of those users, or how much of your marketing budget is going directly towards fake clicks and fake installs.
…

**What happens when I click on an ad?**

Let's say that you're using your iPhone to play a game. A video ad pops up within the game. You watch the video and click the call to action (CTA) to download the app at the end of it. The link takes you to the app in the iTunes store, but briefly redirects you through Adjust. This takes a fraction of a second but is a key step; it's how the attribution provider receives the first data point - the engagement with the ad.

By clicking the link, going to the app store, downloading the app and opening it for the first time, the attribution provider will receive the following data points:

Advertising ID - a string of numbers and letters that identifies every individual smartphone or tablet in the world
IP address – a specific address that devices use to communicate with one another via the internet

First Amended Class Action Complaint                                22-CV-01327 BAS-AHG

User agent – a line of text that identifies a user's browser and operating system
Timestamp – When you clicked on the link
First Install - Activates on first app open
With this information, the attribution provider can determine whether the user is new or existing. If the user is new, the attribution provider will attempt to match the user's install to their engagement with a particular ad. This exchange of information can happen in several ways; the most common is for the app to integrate the attribution provider's SDK.

An SDK (or software development kit) allows apps to communicate with [a mobile analytics company's] servers. App developers integrate the SDK into their app's code, much like if they had a car and a manufacturer gave them a new part for a bit of an upgrade. This creates a line of communication between the app and us through which we can provide attribution data in real time.

https://www.adjust.com/blog/mobile-ad-attribution-introduction-for-beginners, last accessed November 18, 2022.

67.     In addition, Defendant openly acknowledges that its software development kit (SDK), made available to and inserted by other companies as a plug-in to their own smartphone applications, intercepts and reads massive amounts of consumer data using its technology in order to identify unique consumers and report on their travel and habits for marketing, verification, and other purposes:

**SDK Data Privacy and Safety**
Various data is transmitted from the SDK to Kochava. This document describes SDK behavior and which datapoints are transmitted.
…

**When is data transmitted?**
Data is transmitted only during app runtime milestones such as the first app launch, user session envelopes, and when performing host requested activities such as measuring an event. Data is not transmitted otherwise and can only be transmitted while the app is running. When not in use, the SDK remains idle,

awaiting instruction from the host, and does not continuously transmit data to Kochava.

**Is data encrypted?**
Data is always encrypted during transmission via HTTPS.

**Can data transmission be disabled?**
Datapoint transmission may be disabled on an app-wide basis, rather than per-user basis. Many attribution-related datapoint transmissions may be disabled through your Edit App page in the dashboard, while others may be disabled upon request through your client success manager.

**Can data be deleted upon request?**
User data may be deleted from Kochava, so long as the request comes directly from the user.

**Is the IP address transmitted?**
The IP address of the device is an integral part of any network communication and is not explicitly set or controlled by the SDK; thus it is always transmitted when the device communicates with Kochava or any other entity. The IP address is used to derive a general location for purposes of analytics and reporting, but may also play a role in attribution depending on your attribution settings.

**What data is transmitted?**
Datapoints transmitted by the SDK are listed below. Keep in mind that some datapoints vary by SDK or platform, and datapoints are only transmitted if readily available for the given platform, and only if any required modules are present.

**Android Specific Datapoints**
These transmitted datapoints are specific to the Android SDK and are primarily used for attribution and install deduplication. Additionally, many of these datapoints are transmitted only if required modules are present.

| *Datapoint* | *Description* |
|---|---|
| Google Advertising ID identifier. | Google Play Store advertising |

| | |
|---|---|
| Amazon Fire Advertising ID | Amazon advertising identifier. |
| Android ID | Android identifier. |
| Huawei Advertising ID | Huawei advertising identifier. |

## iOS Specific Datapoints

These transmitted datapoints are specific to the iOS/tvOS SDK and are primarily used for attribution and install deduplication.

| *Datapoint* | *Description* |
|---|---|
| IDFA | Apple's identifier for advertisers. The IDFA is automatically redacted as of iOS 14.5 if ATT authorization has not been granted. |
| **IDFV** | **Apple's identifier for vendors.** |
| Apple Search Ads Results | Apple Search Ads attribution results. |
| Install Receipt | The install receipt, which is used for validation. |

## Other Identifiers

These transmitted datapoints are common across most SDK platforms and are primarily used for attribution and install deduplication.

| *Datapoint* | *Description* |
|---|---|
| Facebook Attribution ID | Facebook's internal attribution identifier. |
| Kochava Device ID | Kochava's internal identifier, which is scoped to the current install, rather than the device. |
| User Agent | The user agent of the device. |

## App State Datapoints

These transmitted datapoints are common across most SDK platforms and describe the state of the app. They are used primarily for your analytics and reporting and do not play a role in attribution.

| *Datapoint* | *Description* |
|---|---|
| App Name | The name of the app. |
| App Package/Bundle | The Bundle ID or package name of the app. |

19

| | | |
|---|---|---|
| App Version | App version string(s). | |
| Notifications Enabled | Whether notifications are enabled for the app. | |
| Installer Package | The provider of the app installation (Android only). | |
| Date of Install from Store | The date the app was installed (Android only). | |

**Device State Datapoints**

These transmitted datapoints are common across most SDK platforms and describe the state of the device. They are used for your analytics, reporting and fraud detection; they do not play a role in attribution.

| *Datapoint* | *Description* |
|---|---|
| Architecture | The device architecture. |
| Battery Level | The current battery level. |
| Boot Time | When the device was last booted. |
| Battery Status | The status of the battery. |
| Cellular Carrier Name | The cellular carrier name. |
| Cellular Type | The cellular carrier type. |
| Device Type | The device model. |
| Display Width | The display width in pixels. |
| Display Height | The display height in pixels. |
| Locale Setting | The chosen locale setting. |
| Language Setting | The chosen language setting. |
| Network Is Metered | Whether the network is metered. |
| Network SSID | The SSID. |
| Network BSSID | The BSSID. |
| Orientation | The device orientation. |
| OS Version | The version of the device OS. |
| Platform | The platform of the device. |
| Screen DPI | The screen DPI. |
| Screen Inches | The screen size. |
| Screen Brightness | The current screen brightness. |
| Signal Bars | The current cellular signal bars. |
| Timezone | The chosen timezone setting. |

https://support.kochava.com/reference-information/sdk-data-privacy-and-safety, last accessed November 18, 2022 (bold underline added).

First Amended Class Action Complaint                                   22-CV-01327 BAS-AHG

68.     Defendant's novel approach to intercepting and recording this information, especially the IDFV, is now more important than ever to its business model since the advent of Apple's iPhone Application Tracking Transparency Tracking (ATT) framework.

69.     ATT requires a consumer to affirmatively opt-in to allowing Defendant and others to track their device unique identification number for advertisers on their iPhones:

**What is IDFV?**

Identifier for Vendors (IDFV) | Definition

IDFV stands for "identifier for vendors" and is a universally unique identifier (UUID) used by Apple on many of its devices, including iPhone, iPad, etc. The IDFV is 32 characters long with 4 dashes and can be used to distinguish individual devices engaging with an app.

Unlike the identifier for advertisers (IDFA) which is unique to each app on a device, the IDFV is unique to the app developer account, and is identical across all apps published by that developer that are on the user's device. This enables the IDFV to be used for attribution on cross-promotional acquisition efforts within a developer's own portfolio of apps. Availability of the IDFV will not be affected by the AppTrackingTransparency (ATT) framework, which requires user opt-in to access the IDFA.

https://www.kochava.com/glossary/idfv/#:~:text=IDFV last accessed October 5, 2022.

70.     On industry website described the importance to digital marketing campaigns of capturing IDFV:

**Why is the Identifier for Vendor (IDFV) important?**

IDFVs are important as they provide a means to run cross-promotional iOS campaigns which include 'limit ad tracking' (or LAT) users — without relying on fingerprinting. So long as an IDFV is passed in the

1    tracker URLs, the IDFV can provide marketers with more accurate

2    attribution data for iOS campaigns.

3    https://www.adjust.com/glossary/idfv/ last accessed November 18, 2022.

4         71.    Despite Apple's efforts to provide greater privacy to its users, Defendant

5    ignored these efforts and bypassed the intent of the ATT framework and instead

6    redoubled its efforts to ensure that even users who had turned off app tracking on their

7    phones would still be tracked without their knowledge and consent.

8         72.    Defendant intercepts and tracks iPhone users, such as Plaintiff,

9    communicated choice with respect to Apple's no-tracking setting and the fact that they

10   have told apps not to track them and thereafter communicates even that choice to its

11   clients in their reporting. https://support.kochava.com/analytics-reports-api/reports-

12   overview/ last accessed November 18, 2022.

13        73.    Defendant has actually published a testing app for its customer developers

14   on Apple's Store that demonstrates how Kochava actively collects both IDFA and

15   IDFV, even after a consumer thinks they have disabled all tracking by apps on an

16   iPhone, as shown below:

17

18

19

20

21

22

23

24

25

26

27

28

First Amended Class Action Complaint                              22-CV-01327 BAS-AHG

**Fig. 1 – Screenshots from Kochava ID Tracking App**

*Tracking Turned On*                    *Tracking Turned Off*

 

74.    In other words, even when consumers like the Plaintiff tried to protect their privacy by disabling IDFA device tracking, Defendant eviscerated those efforts by doing an end-run around those consumer protections and gathered IDFV and other fingerprinting information which allowed to continue to track consumers without their knowledge or consent, thus further invading their privacy.

| First Amended Class Action Complaint | 22-CV-01327 BAS-AHG |

75.     By actively intercepting this digital information, including IDFV, without the consent of knowledge of consumers like Plaintiff, Defendant is able to deliver targeted advertising to those consumers while tracking their locations, spending habits, and personal characteristics, while sharing this rich personal data simultaneously with untold numbers of third-party companies by in essence "fingerprinting" each unique device and user, as well as connecting users across devices and devices across users.

76.     Defendant, without consent, surreptitiously intercepts and collects Plaintiff's and Class Members' activity while using smartphone applications that have installed its SDK both as to Apple iPhone and Android mobile devices.

77.     This data collection includes all sorts of website information, as well as Plaintiffs' and Class Members' respective IP addresses, browser and device information, user IDs, geolocation data, and other data, are used by Defendant to "fingerprint" individuals across the internet for Defendant's benefit, deriving revenue from the targeted marketing and sale of this information to third parties.

78.     Defendant intercepts, tracks and passes along the search terms used by a device user which resulted in that user clicking on a particular advertisement as well as other user-specific communications with the application into which its SDK has been integrated on their Apple or Android device. https://support.kochava.com/analytics-reports-api/reports-overview, last accessed November 18, 2022.

79.     Defendant also tracks, intercepts, receives and records specific communications from its SDK-installed apps such as customer's usernames, customer emails and customer IDs on their Apple or Android cellular telephone devices. *Id.*

80.     Defendant tracks, intercepts, receives and records a user's activities within an app after it has been installed, including the length of time it observed a user's behavior within the app, the event that generated the highest revenue, a list of all interactions the user took within the app, the range of revenue generated, and the total number of user events recorded with the names of each event on their Apple or Android device. *Id.*

81.     Defendant's SDK has the ability to be customized by its end-user developers to pass customized communication parameters back to Defendant based upon user inputs to their Apple or Android device. *Id.*

82.     Defendant's SDK tracks, intercepts, receives, records and communicates the gender of a user, as well as their longitude, latitude, country, state, and city when they communicate with an app on their mobile Apple or Android device. *Id.*

83.     Defendant has a huge and diverse client base of paid recipients of this consumer reporting data that includes, amongst others:

- 7-Eleven
- Airbnb
- Audible.com
- Capcom
- CBS
- Chevron
- Chick-Fil-A
- Choice Hotels
- Discovery Channel
- Disney+
- Dunkin Doughnuts
- Groupon
- GSN Channel
- Hilton Hotels
- Intuit
- John Hancock
- Kroger
- Little Caesars
- McDonalds
- NBC
- WesternUnion
- Priceline
- Roku
- SiriusXM
- Sling
- Sonic
- Univision
- UFC

| First Amended Class Action Complaint | 22-CV-01327 BAS-AHG |
|---|---|

- Venmo
- Zappos

https://www.kochava.com/kochava-difference/?int-link=menu-competitive-differences, last accessed August 29, 2022.

84. Upon good faith information and belief, Defendant and others installed software Defendant's SDK onto Plaintiff's cellular telephone which intercepts, receives and records geo-location data from Plaintiff's whereabouts, as well as his the previously described datapoints on his cellular smartphone, but without Plaintiff's express consent or knowledge and then created consumer reports based upon this intercepted and recorded information.

85. Defendant uses its software to combine this information with other data points Defendant has obtained about Plaintiff to create a composite of Plaintiff's physical locations and consumer behavior.

**Defendant's Data Can Be Used to Identify People
and Track Them to Sensitive Locations**

86. The FTC Complaint also details how precise geolocation data associated with Apple's IDFA and Android's ADID, collectively referred to herein as MAIDs (mobile advertising identifiers), such as the data sold by Defendant, may be used to track consumers to sensitive locations, including places of religion, domestic abuse shelters, places inferring LGBTQ+ identification, medical facilities, welfare and homeless shelters, and reproductive health clinics.

87. Defendant's methodology for intercepting these communications and surreptitiously tracking these geolocations through its SDK are essentially identical between Apple iPhones and Android devices, with small technical differences based upon each devices operating systems.

88. For example, Apple refers to its unique advertising identification number on a device as an IDFA, whereas Android refers to this advertising identifier as an ADID, although they are functionally identical for Defendant's purposes in that they

provide a unique advertising identifier for the device that is being intercepted and tracked by Defendant.

89.   Since each set of coordinates is time-stamped, it is also possible for Defendant to identify when a mobile device visited a certain location.

90.   Defendant does not anonymize the location data it provides, meaning it is possible to use the geolocation data combined with the mobile device's MAID to identify the user or owner of the device.

91.   If the MAID for a particular device is unavailable to Defendant because tracking has been disabled on the device, Defendant uses a myriad of other techniques such as IDFV, fingerprinting, and other strategies to positively identify the device's user.

92.   The location data sold by Defendant typically includes multiple timestamped signals for each MAID and IDFV. By plotting each of these signals of a map, much can be inferred about the mobile device owners. For example, the location of the mobile device at night likely corresponds to the user's home address. This, coupled with other public records, can easily identify the name of the owner or resident of a particular address.

93.   Defendant has even recognized that its data may be used to track mobile devices to home address. In its marketing on the AWS Marketplace, it has suggested "Household Mapping" as a potential use case of the data.

94.   Defendant employs no technical controls to prohibit its customers from identifying consumers or tracking them to sensitive locations.

### Defendant Practices Cause and Are Likely
### to Cause Substantial Injury to Consumers

95.   As described above, the data collected, stored, and sold by Defendant may be used to identify individual consumers and their visits to sensitive locations. The collection and sale of such data poses an unwarranted and unauthorized intrusion into

First Amended Class Action Complaint                          22-CV-01327 BAS-AHG

the most private areas of a consumer's life and caused or is likely to cause substantial injury to the consumers.

96.    The dangers associated with Defendant's practices are numerous. For example, the data set makes it possible to identify a mobile device which visited a reproductive health clinic or can demonstrate a person's routine by showing location data from a particular address, numerous times, in a single week.

97.    Defendant collects and stores and disseminates this data all without the user's knowledge or consent.

98.    Allowing a person access to such information, even for a seven-day period, can cause substantial injury to the user.

99.    Identification of sensitive and private characteristics of consumers from the location data sold and offered by Defendant injures or is likely to injure consumers through exposure to stigma, discrimination, physical violence, emotional distress, and other harms.

100.    Such injuries are exacerbated by the fact that Defendant lacks any meaningful control over who accesses its location data feed.

101.    The collection and use of their location data by Defendant are completely unknown and/or opaque to consumers, who typically do not know who has collected their location data and how it is being used—let alone to consent to the interception and use of that data.

102.    Once the information has been collected and stored, the information can be sold multiple times to companies those consumers have never heard of and never interacted with. Consumers are therefore unable to take reasonable steps to avoid the above-described injuries.

103.    By Defendant's own admissions the data collected violates California's broad remedial statutory scheme supporting consumer privacy rights, as codified under Cal. Pen. Code § 630, *et seq.*

1    "Kochava operates two business units, which offer digital marketing and
2    analytics services. It's [sic] primary business unit provides mobile advertising
3    attribution through a set of customizable software tools ("Software as a Service" aka
4    "SAAS") that allow Kochava's customers to obtain various data points and analytics
5    for the customers' digital marketing campaigns and applications. Specifically, Kochava
6    develops a set of software tools and programs that device application ("app") developers
7    can use to measure, track, organize, and visualize mobile app data for their marketing
8    campaigns across marketing channels and partners. Kochava's secondary business unit,
9    the Kochava Collective ("Collective"), is an aggregator of third-party provided mobile
10   device data, which Kochava makes available through its proprietary data marketplace.
11   *See Kochava, Inc. v. Federal Trade Commission*; 2:22-cv-00349-BLW (Dist. Idaho),
12   ¶ 7.

13        104.   Defendant itself admits that it tracks sensitive consumer geo location data,
14   in violation of California law:

15             The FTC's allegations regarding Kochava's alleged business
16        practices illustrate a lack of understanding of Kochava's
          services. As part of its Collective services, Kochava does not
17        uniquely identify users, but collects Mobile Advertising
18        Identifier (MAID) information and links it to hashed emails and
          primary IP addresses in relation to Kochava's Data Marketplace.
19        Although the Kochava Collective collects latitude and longitude,
20        IP address and MAID associated with a consumer's device,
          Kochava does not receive these data elements until days after
21        (unlike a GPS tool, for instance), Kochava does not identify the
22        location associated with latitude and longitude, nor does
          Kochava identify the consumer associated with the MAID. As
23        such, Kochava does not collect, then subsequently sell data
24        compilation that allows one to track a specific individual to a
          specific location. Even if an injury to the consumer did indeed
25        occur, it is reasonably avoidable by the consumer themselves by
26        way the opt-out provision to allow the data collection. In other
          words, the consumer agreed to share its location data with an app
27        developer. As such, the consumer should reasonably expect that
28        this data will contain the consumer's locations, even locations
          which the consumer deems is sensitive. Prior to the data

collection, a disclaimer or a warning was also provided to a consumer regarding collection of data from all locations, including sensitive ones.

*Id.* at ¶ 19.

105. In fact, Defendant recognizes the damage it has done to California consumers and in response to an imminent FTC action, it proactively introduced a new feature that allegedly now blocks the gathering of private, sensitive, location data related to health care facilities:

> On August 10, 2022, Kochava, announced a capability for its Kochava Collective marketplace. The Kochava Collective is an independent data marketplace for connected mobile devices. The new capability is a "Privacy Block" which removes health services location data from the Kochava Collective marketplace. Privacy Block aggregates health services locations which have been identified by a broad range of industry partners into a unified, super- set definition of health services locations. Privacy Block bolsters consumer privacy by leveraging multiple vendor location definitions for what each vendor determines is a health services location, and blocks the onward transfer of this data. Kochava invited data brokers and adtech industry vendors to register to participate with Privacy Block and contribute to the database. In addition, those in the health services sector were invited to register to block their location directly in Privacy Block. Even if consumers previously consented to share their location data, Privacy Block blocks the sharing of health services locations.

*Id.* at ¶¶ 26-27.

**<u>Defendant's Unlawful Recording of Confidential Communications</u>**

106. California Penal Code § 632(a) prohibits recording of such confidential communications, including digital communications like those between Plaintiff and Defendant, without the consent of the other person states:

First Amended Class Action Complaint                                    22-CV-01327 BAS-AHG

> A person who, intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio [violates this section].

107. California Penal Code § 632.7(a) is clear in its prohibition against such unauthorized recording of any communications without the consent of all parties to the communication:

> Every person who, without the consent of all parties to a communication, intercepts or receives and intentionally records, or assists in the interception or reception and intentional recordation of, a communication transmitted between two cellular radio telephones, a cellular radio telephone and a landline telephone, two cordless telephones, a cordless telephone and a landline telephone, or a cordless telephone and a cellular radio telephone [violates this section].

108. California Penal Code § 637.2 permits Plaintiff to bring this action for any violation of California Penal Code § 632.7(a) and provides for statutory damages of $5,000 for each violation.

109. Defendant recorded or otherwise made an unauthorized connection to Plaintiff's confidential communications in violation of California's statutory and common law against such unlawful intrusions into a person's private affairs, including the California Constitution's prohibition in Article 1, Section 1.

110. This suit seeks only damages and injunctive relief for recovery of economic injury and it expressly is not intended to request any recovery for personal injury and claims related thereto.

111. Plaintiff is informed and believes, and thereon alleges, that Defendant intentionally recorded a confidential communication as prohibited by California Penal Code § 632.

112.   Plaintiff is informed and believes, and thereon alleges, that Defendant intentionally recorded a communication transmitted between a cellular radio telephone and a landline telephone without Plaintiff's consent as prohibited by California Penal Code § 632.7(a).

113.   Defendant violated Plaintiff's constitutionally protected privacy rights by failing to advise or otherwise provide notice at the beginning of the recorded communication with Plaintiff that the communication would be recorded, and Defendant did not try to obtain the Plaintiff's consent before such recording.

114.   The recording or other unauthorized connection was done without Plaintiff's prior knowledge or consent. Plaintiff was damaged thereby, as detailed herein, in at least an amount permitted by the statutory damages mandated by California Penal Code § 637.2(a).

115.   Defendant, its employees or agents, secretly recorded a cellular communication made involving Plaintiff and others. At no time before, during, or after any of the communications was Plaintiff warned, told, advised or otherwise given any indication by Defendant, its employees or agents, that the content of his communications were recorded.

116.   As a result thereof, Plaintiff has been damaged as set forth in the Prayer for Relief herein.

117.   Plaintiff seeks statutory damages and injunctive relief under California Penal Code § 637.2.

## **Defendant's Unlawful Disclosure of Telephonic Messages**

118.   California Penal Code § 637 prohibits the disclosure of telephonic messages (emphasis added):

> **§ 637. Disclosure of telegraphic or telephonic message; punishment; exception**
>
> Every person not a party to a telegraphic or telephonic communication who **willfully discloses the contents of a telegraphic or telephonic message, or any part thereof,**

First Amended Class Action Complaint                    22-CV-01327 BAS-AHG

> **addressed to another person**, without the permission
> of that person, unless directed so to do by the lawful order of a court,
> is punishable by imprisonment pursuant to subdivision (h) of
> Section 1170, or in a county jail not exceeding one year, or by fine
> not exceeding five thousand dollars ($5,000), or by both that fine
> and imprisonment.

119.   This suit seeks only damages and injunctive relief for recovery of economic injury and it expressly is not intended to request any recovery for personal injury and claims related thereto.

120.   Plaintiff is informed and believes, and thereon alleges, that Defendant intentionally intercepted, received, recorded and then disclosed Plaintiff's and the other Class Members telephonic messages, and or parts thereof, while using its software devices on cellular telephones, as prohibited by California Penal Code § 637, and as described further herein.

121.   Defendant violated Plaintiff's constitutionally protected privacy rights by failing to advise or otherwise provide notice at the beginning of the disclosing such telephonic messages by Plaintiff that the sensitive and private messages would be disclosed, and Defendant did not try to obtain the Plaintiff's consent before such disclosures.

122.   These disclosures of Plaintiff and Class Member's telephonic messages by Defendant as described further herein was unauthorized and done without their prior knowledge or consent. Plaintiff and the other Class Members were damaged thereby, as detailed herein, in at least an amount permitted by the statutory damages mandated by California Penal Code § 637.2.

123.   As a result thereof, Plaintiff has been damaged as set forth in the Prayer for Relief herein.

124.   Plaintiff seeks statutory damages and injunctive relief under California Penal Code § 637.2.

## PLAINTIFF'S AND CLASS MEMBERS' PERSONAL INFORMATION AND GEOLOCATION DATA CONSTITUTE COMMUNICATIONS

125.   The data that Defendant intercepts and transmits, from Plaintiff's and Class members' mobile devices, directly communicate specific device user decisions, actions, choices, and activities of such users such as selection of search terms, click choices, purchase decisions and/or payment methods, amongst others.

126.   Defendant goes beyond simply gathering static information with its SDK but rather actively monitors, intercepts, and records specific user input events and choices that a mobile device user communicates through their mobile device by that user's affirmative actions, such as clicking a link, installing an app, selecting an option, or relaying a response.

127.   Defendant thereafter combines and aggregates these device users' intercepted communications with other data it has gather about a particular user to create actionable intelligence about that user to others for the ultimate purpose of marketing, adverting, and selling to products and services to that user.

128.   Moreover, the geolocation data that Defendant gathers and combines with all of the other communication information it intercepts is inextricably linked to those communications and is essential in providing context and clarity to those communications.

129.   For example, the fact that a person communicates by selecting a button to purchase a coffee at a ballpark holds an entirely different meaning that if that same person purchases a coffee at an abortion clinic. Likewise, a person ordering a pizza at the beach sends a different communication than if they had ordered that same pizza from a hospice.

130.   Defendant's geolocation tracking is an essential element of the communications which it intercepts and is inseparable from it contextually.

First Amended Class Action Complaint                                     22-CV-01327 BAS-AHG

## PLAINTIFF AND CLASS MEMBERS WERE HARMED BY THE INVASION OF THEIR PRIVACY

131.   Plaintiff and Class members are harmed by Defendant's multiple invasions of their privacy.

132.   Defendant obtained personal data, communications, and information about Plaintiffs and Class members, including Plaintiff's and Class members' location data.

133.   The data, information and communications that Defendant surreptitiously obtains from Plaintiff's and Class members' cellphones can and are used by Defendant and the third parties to whom Defendant sells Plaintiff's and Class members' information to identify them and make personalized advertisements to Plaintiff and Class members individually.

134.   Even when individuals attempt to take affirmative steps to protect their privacy, Defendant designed its SDK to circumvent those efforts. Defendant's SDK continues to track Plaintiff's and Class members' movements, monitor their application selections, choices, uses, and communications, and combined that valuable private information with other data sets to sell to third-parties for advertising, sales, and marketing purposes against their wishes.

135.   Defendant fails to inform or obtain consent from Plaintiff and Class members track, collect, obtain, and sell their data, location history, communications and personal information.

136.   Moreover, the depth and breadth of data and communications that Defendant surreptitiously obtains from Plaintiff and Class members can be easily used to individually identify Plaintiff and Class members and their movements and habits. As shown in the articles cited above, including to identify individual's residences, places of employment, and locations they have visited, and such information could be used against, in various manners.

# CLASS ACTION ALLEGATIONS

137.   Plaintiff brings this lawsuit as a class action on behalf of himself and, pursuant to Federal Rule of Civil Procedure 23, on behalf of all those similarly situated. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

138.   Plaintiff proposes the following Class, consisting of and defined as follows:

> All persons in California downloaded an app with Kochava's SDK
> on the personal mobile device.

139.   Excluded from the Class are: (1) Defendant, any entity or division in which Defendant has a controlling interest, and its legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; and (3) those persons who have suffered personal injuries as a result of the facts alleged herein. Plaintiff reserves the right to redefine the Class and to add subclasses as appropriate based on discovery and specific theories of liability

140.   **Numerosity**: The Class Members are so numerous that joinder of all members would be unfeasible and impractical. The membership of the entire Class is currently unknown to Plaintiff at this time; however, given that, on information and belief, Defendant accessed millions of unique mobile devices, it is reasonable to presume that the members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

141.   **Commonality**: There are common questions of law and fact as to Class Members that predominate over questions affecting only individual members, including, but not limited to:

A.     Whether Plaintiff and Class members had a reasonable expectation of privacy under the circumstances;

First Amended Class Action Complaint                                    22-CV-01327 BAS-AHG

B.      Whether Defendant's conduct invaded Plaintiff's and Class members' privacy;

C.      Whether Defendant knowingly accessed Plaintiff's and Class members' computers;

D.      Whether Defendant knowingly took, copied, or made use of data from Plaintiff's and Class members' computers;

E.      Whether Defendant had permission from Plaintiff and Class members to access their computers;

F.      Whether Defendant's SDK constitutes a pen register device;

G.      Whether Defendant's SDK transmits data from Class members' mobile phones to itself;

H.      Whether Defendant's SDK transmits Class members' communications to itself;

I.      Whether Defendant intercepted Class members' confidential communications;

J.      Whether Defendant disseminated information concerning Class members to third parties;

K.      Whether Defendant disseminated Class members' confidential communications to third parties;

L.      Whether Defendant recorded Plaintiff's and Class members' communications;

M.      Whether Defendant's conduct constitutes unfair acts or practices;

N.      Whether Defendant's conduct violates the UCL; and

O.      Whether Defendant was unjustly enriched.

142.  **Typicality**: Plaintiff's wire and cellular telephone communications were intercepted, unlawfully tapped and recorded without consent or a warning of such interception and recording, and thus, his injuries are also typical to Class Members.

First Amended Class Action Complaint                                              22-CV-01327 BAS-AHG

143.   Plaintiff and Class Members were harmed by the acts of Defendant in at least the following ways: Defendant, either directly or through its agents, illegally intercepted, tapped, recorded, and stored Plaintiff and Class Members' digital communications, geolocations, and other sensitive personal data from their digital devices with others, and Defendant invading the privacy of said Plaintiff and Class. Plaintiff and Class Members were damaged thereby.

144.   Further, the communications at issue were concerning matters which constitutes a "confidential" communication pursuant to California Penal Code §632.

145.   **Adequacy**: Plaintiff is qualified to, and will, fairly and adequately protect the interests of each Class Member with whom he is similarly situated, as demonstrated herein. Plaintiff acknowledges that he has an obligation to make known to the Court any relationships, conflicts, or differences with any Class Member. Plaintiff's attorneys, the proposed class counsel, are versed in the rules governing class action discovery, certification, and settlement. In addition, Plaintiff's attorneys, the proposed class counsel, are versed in the rules governing class action discovery, certification, and settlement. The proposed class counsel is experienced in handling claims involving consumer actions and violations of the California Penal Code §§ 632 and 632.7. Plaintiff has incurred, and throughout the duration of this action, will continue to incur costs and attorneys' fees that have been, are, and will be, necessarily expended for the prosecution of this action for the substantial benefit of each Class Member.

146.   **Predominance**: Questions of law or fact common to the Class Members predominate over any questions affecting only individual members of the Class. The elements of the legal claims brought by Plaintiff and Class Members are capable of proof at trial through evidence that is common to the Class rather than individual to its members.

147.   **Superiority**: A class action is a superior method for the fair and efficient adjudication of this controversy because:

First Amended Class Action Complaint                                    22-CV-01327 BAS-AHG

A.   Class-wide damages are essential to induce Defendant to comply with California and Federal law.

B.   Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendant's misconduct.

C.   Management of these claims is likely to present significantly fewer difficulties than those presented in many class claims.

D.   Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law.

E.   Class action treatment is manageable because it will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would endanger.

F.   Absent a class action, Class Members will continue to incur damages, and Defendant's misconduct will continue without remedy.

148.   Plaintiff and the Class Members have all suffered and will continue to suffer harm and damages as a result of Defendant's unlawful and wrongful conduct. A class action is also superior to other available methods because as individual Class Members have no way of discovering that Defendant intercepted and recorded the Class Member's telephonic digital communications without Class Members' knowledge or consent.

149.   The Class may also be certified because:

A.   the prosecution of separate actions by individual Class Members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of

First Amended Class Action Complaint                                    22-CV-01327 BAS-AHG

other Class Members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

B.   Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the members of the Class as a whole.

150.   This suit seeks only damages and injunctive relief for recovery of economic injury on behalf of Class Members and it expressly is not intended to request any recovery for personal injury and claims related thereto.

151.   The joinder of Class Members is impractical and the disposition of their claims in the Class action will provide substantial benefits both to the parties and to the court. The Class Members can be identified through Defendant's records.

## CAUSES OF ACTION

### COUNT ONE
**Invasion of Privacy**

152.   Plaintiff repeats, re-alleges, and incorporates by reference preceding paragraphs above as if fully set forth herein.

153.   The California Constitution recognizes the right to privacy inherent in all residents of the State and creates a private right of action against private entities that invade that right.

154.   Article I, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

155.   The right to privacy was added to the California Constitution in 1972, through Proposition 11 (called the "Right to Privacy Initiative"). Proposition 11 was designed to codify the right to privacy, protecting individuals from invasions of privacy

from both the government and private entities alike: "The right of privacy is the right to be left alone. It is a fundamental and compelling interest. . . . It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us. Fundamental to our privacy is the ability to control circulation of personal information." Ballot Pamp., Proposed Stats. and Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972), argument in favor of Prop. 11, p. 27; *see also Hill v. Colorado,*530 U.S. 703, 716 (2000) (the right to privacy includes right to be free in one's home from unwanted communication); *Hill v. National Collegiate Athletic Assn.* (1994), 7 Cal.4th 1, 81, (Mosk, J., dissenting).

156.  Plaintiff and Class members have a legally protected privacy interests, as recognized by the California Constitution, CIPA, common law and the 4th Amendment to the United States Constitution.

157.  Plaintiff and Class members had a reasonable expectation of privacy under the circumstances, as they could not have reasonably expected that Defendant would violate state and federal privacy laws. Plaintiff and Class members were not aware and could not have reasonably expected that unknown third party would install software on their mobile devices that would track and transmit their physical location and communications, and share Plaintiff's and Class members' personal information with other parties.

158.  Defendant's conduct violates, at a minimum:

    A.    The right to privacy in data, communications and personal information contained on personal devices;

    B.    The California Constitution, Article I, Section 1;

    C.    The California Wiretapping Act;

    D.    The California Invasion of Privacy Act; and

    E.    The California Computer Data Access and Fraud Act.

159.   Defendant's conduct in secretly intercepting and collecting Plaintiff's and Class members' personal information, location data, and communications is an egregious breach of societal norms and is highly offensive to a reasonable person.

160.   Defendant's conduct in analyzing, using, and sharing with third parties the personal information and communications that Defendant intercepted and took from Plaintiff's and Class members is an egregious breach of societal norms and is highly offensive to a reasonable person, and violates Plaintiff's ad Class members' reasonable expectations of privacy.

161.   Plaintiff and Class members did not consent for Defendant to track, collect, or use their personal information and communications.

162.   As a direct and proximate result of Defendant's invasion of their privacy, Plaintiff and Class members were injured and suffered damages. Plaintiff and Class members are entitled to equitable relief and just compensation in an amount to be determined at trial.

163.   Defendant was unjustly enriched as a result of its invasion of Plaintiff's and Class members' privacy.

### COUNT TWO
**Violation of the California Computer Data Access and Fraud Act**
***Cal. Penal Code. § 502***

164.   Plaintiff repeats, re-alleges, and incorporates by reference preceding paragraphs above as if fully set forth herein.

165.   The California legislature enacted the CDAFA with the intent of "expand[ing] the degree of protection afforded to individuals . . . from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems." Cal. Penal Code § 502(a). The enactment of CDAFA was motivated by the finding that "the proliferation of computer technology has resulted in a concomitant proliferation of . . . unauthorized access to computers, computer systems, and computer data." *Id.*

First Amended Class Action Complaint                                    22-CV-01327 BAS-AHG

166.   Plaintiff's and Class members' smartphone constitute "computers" within the scope of the CDAFA.

167.   Defendant violated the following sections of the CDAFA:

     A.   Section 502(c)(1), which makes it unlawful to "knowingly access[] and without permission . . . use[] any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data;"

     B.   Section 502(c)(2), which makes it unlawful to "knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network;"

     C.   Section 502(c)(7), which makes it unlawful to "knowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network."

168.   Defendant knowingly accessed Plaintiff's and Class members' smartphones without their permission by including within the SDK, that Defendant provides to developers, software that intercepts and transmits data, communications, and personal information concerning Plaintiff and Class members.

169.   Defendant used data, communications, and personal information that it intercepted and took from Plaintiff's and Class members' smart phones to wrongfully and unjustly enrich itself at the expense of Plaintiff and Class members.

170.   Defendant took, copied, intercepted, and made use of data, communications, and personal information from Plaintiff's and Class members' smartphones.

171.  Defendant knowingly and without Plaintiff's and Class members' permission accessed or caused to be their smartphones by installing without Plaintiff's and Class members' informed consent software that intercepts and/or takes data, communications, and personal information concerning Plaintiff and Class members.

172.  Plaintiff and Class members are residents of California, and used their smartphones in California. Defendant accessed or caused to be accessed Plaintiff's and Class members' data, communications, and personal information from California. On information and belief, Defendant uses servers located in California that allow Defendant to access and process the data, communications and personal information concerning Plaintiff and Class members.

173.  Defendant was unjustly enriched by intercepting, acquiring, taking, or using Plaintiff's and Class members' data, communications, and personal information without their permission, and using it for Defendant's own financial benefit. Defendant has been unjustly enriched in an amount to be determined at trial.

174.  As a direct and proximate result of Defendant's violations of the CDAFA, Plaintiff and Class members suffered damages.

175.  Pursuant to CDAFA Section 502(e)(1), Plaintiff and Class members seek compensatory, injunctive and equitable relief in an amount to be determined at trial.

176.  Pursuant to CDAFA Section 502(e)(2), Plaintiff and Class members seek an award of reasonable attorneys' fees and costs.

177.  Pursuant to CDAFA Section 502(e)(4), Plaintiff and Class members seek punitive or exemplary damages for Defendant's willful violations of the CDAFA.

## COUNT THREE
### Use of a Pen Register or Trap and Trace Device
### Cal. Penal Code § 638.51

178.  Plaintiff repeats, re-alleges, and incorporates by reference preceding paragraphs above as if fully set forth herein.

179.  California Penal Code Section 638.50(b) defines a "pen register" as "a device or process that records or decodes dialing, routing, addressing, or signaling

44

information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."

180.  California Penal Code Section 638.51 prohibits any person from using a pen register without a court order.

181.  Defendant's SDK constitutes a "pen register" because it is a device or process that records addressing or signaling information—Plaintiff's and Class members' location data and personal information—from the electronic communications transmitted by their smartphones.

182.  Defendant was not authorized by any court order to use a pen register to track Plaintiff's and Class members' location data and personal information.

183.  As a direct and proximate result of Defendant's conduct, Plaintiff and Class members suffered losses and were damaged in an amount to be determined at trial.

## COUNT FOUR
### Violation of the California Wiretapping Act
### Cal. Penal Code § 631

184.  Plaintiff repeats, re-alleges, and incorporates by reference preceding paragraphs above as if fully set forth herein.

185.  At all relevant times, there was in full force and effect the California Wiretapping Act, Cal. Penal Code § 631.

186.  The California legislature enacted the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 630, *et seq.*, including the Wiretapping Act, "to protect the right of privacy" of residents of California. Cal. Penal Code § 630.

187.  The California legislature was motivated to enact CIPA by a concern that the "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." *Id.*

188. The California Wiretapping Act prohibits:

"any person [from using] any machine, instrument, [] contrivance, or in any other manner . . . [from making] any unauthorized connection, whether physically, electronically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or who willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section[.]

189. Plaintiff's and Class members' specific user input events and choices on their mobile devices that are tracked by Defendant's SDK communicates the user's affirmative actions, such as clicking a link, installing an app, selecting an option, or relaying a response, and constitute communications within the scope of the Wiretapping Act.

190. Plaintiff and Class members are residents of California, and used their smartphones within California. As such, Defendant intercepts, reads, or attempts to reads Plaintiff's and Class members' data, communications, and personal information in California.

191. On information and belief, Defendant uses servers in California to intercept, track, process, or otherwise use Plaintiff's and Class members' data, communications, and personal information within California.

192. Defendant intercepts Plaintiff's and Class members' communications while they are in transit to and from Plaintiff's and Class members' smartphones and the apps, app developers, and cellphone towers; Defendant transmits a copy of Plaintiff's and Class members' communications to itself. Defendant uses the contents

46

of the communications to sell to third parties and in other methods for its own pecuniary gain.

193.  Neither Defendant nor any other person informed Plaintiff and Class members that Defendant was intercepting and transmitting Plaintiff's private communications. Plaintiff and Class members did not know Defendant was intercepting and recording their communications, as such they could not and did not consent for their communications to be intercepted by Defendant and thereafter transmitted to others.

194.  Defendant's SDK constitutes a machine, instrument, contrivance or other manner to track and intercept Plaintiff's and Class members' communications while they are using their smartphones.

195.  Defendant uses and attempts to use or communicate the meaning of Plaintiff's and Class members' communications by ascertaining their personal information, including their geolocation and places that they have visited, in order to sell Plaintiff's and Class members' personal information to third parties.

196.  At all relevant times to this complaint, Defendant intercepted and recorded components of Plaintiff's and the putative class' private telephone communications and transmissions when Plaintiff and other Class Members accessed Defendant's software via their cellular mobile access devices within the State of California.

197.  At all relevant times to this complaint, Plaintiff and the other Class Members did not know Defendant was engaging in such interception and recording and therefore could not provide consent to have any part of their private and confidential videoconferencing communications intercepted and recorded by Defendant and thereafter transmitted to others.

198.  At the inception of Defendant's illegally intercepted and stored his geolocation and other personal data, Defendant never advised Plaintiff or the other Class Members that any part of this sensitive personal data would be intercepted, recorded and transmitted to third parties.

199.   Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc.*, 2006 WL 3798134, at *5-6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litigation*, --- F.3d --- 2020 WL 1807978 (9th Cir. Apr. 9, 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' Internet browsing history).

200.   Defendant's use of MAIDs, IDFAs, IDFVs and its SDK are both a "machine, instrument, contrivance, or . . . other manner" used to engage in the prohibited conduct at issue here.

201.   At all relevant times, by using Defendant's MAID software and SDK as well as tracking Plaintiff's and Class Member's geolocation, Defendant intentionally tapped, electrically or otherwise, the lines of internet communication between Plaintiff and class members on the one hand, and the specific sites and locations Plaintiffs and Class Members visited on the other.

202.   At all relevant times, by using Defendant's geolocation tracking software technology, Defendant willfully and without the consent of all parties to the communication, or in any unauthorized manner, read or attempted to read or learn the contents or meaning of electronic communications of Plaintiff and putative class members, while the electronic communications were in transit or passing over any wire, line or cable or were being sent from or received at any place within California.

203.   Plaintiff and Class Members did not consent to any of Defendant's actions in implementing these wiretaps within its geolocation tracking software. Nor have Plaintiff or Class Members consented to Defendants' intentional access, interception, reading, learning, recording, and collection of Plaintiff and Class Members' electronic communications.

204.   Plaintiff's and the Class Members devices of which Defendant accessed through its unauthorized actions included their computers, smart phones, and tablets and/or other electronic computing devices.

205.   Defendant violated Cal. Penal Code § 631 by knowingly accessing and without permission accessing Plaintiffs' and Class members' devices in order to obtain their personal information, including their device and location data and personal communications with others, and in order for Defendant to share that data with third parties, in violation of Plaintiff's and Class Members' reasonable expectations of privacy in their devices and data.

206.   Defendant violated Cal. Penal Code § 631 by knowingly and without permission intercepting, wiretapping, accessing, taking and using Plaintiffs' and the Class Members' personally identifiable information and personal communications with others.

207.   As a direct and proximate result of Defendant's violation of the Wiretapping Act, Plaintiff and Class members were injured and suffered damages, a loss of privacy, and loss of the value of their personal information in an amount to be determined at trial.

208.   Defendant was unjustly enriched by its violation of the Wiretapping Act.

209.   Pursuant to California Penal Code Section 637.2, Plaintiff and Class members have been injured by Defendant's violation of the Wiretapping Act, and seek damages for the greater of $5,000 or three times the amount of actual damages, and injunctive relief.

### COUNT FIVE
#### RECORDING OF CONFIDENTIAL CALLS
#### CALIFORNIA PENAL CODE § 632

210.   Plaintiff repeats, re-alleges, and incorporates by reference, all other paragraphs.

211.   Defendant is a "person" as defined by Cal. Penal Code § 632(b).

212.   Plaintiff's and Class members' communications were confidential because Plaintiffs and Class members reasonable intended that the communications would be confined to the parties to the communications.

213.   Defendant, through the use of its SDK and other methods described herein, used a device to surreptitiously record Plaintiff's and Class members' confidential communications.

214.   Defendant intentionally intercepts and records Plaintiff's and Class members' confidential communications, because Defendant designed its SDK to intercept and record confidential communications, and Defendant provided its SDK to app developers to use in their apps.

215.   Because of the nature of its business, the data that Defendant intercepts and obtains concerning Plaintiff and Class members, including their geolocation and other private and sensitive data and communications, constitute "confidential" communications.

216.   Plaintiff and all Class Members have an expectation of privacy in their communication that were intercepted and recorded by Defendant, and did not expect, or have knowledge of, any such illegal recording or other unauthorized connections to their communications.

217.   Defendant failed and continues to fail to inform, advise or warn Plaintiff and Class members that their confidential communications with third parties would be recorded.

218.   Plaintiff and Class members did not consent for Defendant to intercept or record their confidential communications.

219.   As a direct and proximate result of Defendant's violation of Section 632, Plaintiff and Class members were injured and suffered damages, a loss of privacy, and loss of the value of their personal information in an amount to be determined at trial.

220.   Defendant failed to obtain consent of Plaintiff and Class members prior to recording any of their confidential communications.

First Amended Class Action Complaint                                    22-CV-01327 BAS-AHG

221.   Pursuant to California Penal Code Section 637.2, Plaintiff and Class members have been injured by Defendant's violation of Section 632, and seek damages for the greater of $5,000 or three times the amount of actual damages, and injunctive relief.

222.   Plaintiff's counsel is also entitled to attorneys' fees and costs pursuant to Cal. Code of Civ. Proc. § 1021.5.

### COUNT SIX
**Unfair Practices**
**in Violation of the California Unfair Competition Law**
**Cal. Bus. & Prof. Code § 17200**

223.   Plaintiff repeats, re-alleges, and incorporates by reference preceding paragraphs above as if fully set forth herein.

224.   At all relevant times there was in full force and effect the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §17200, *et seq.*, which prohibits, *inter alia*, "any unlawful, *unfair*, or fraudulent business act or practice" and "unfair, deceptive, untrue, or misleading advertising." Cal. Bus. & Prof. Code §17200 (emphasis supplied).

225.   Defendant engaged in business acts and practices which are "unfair" under the UCL, including surreptitiously collecting, tracking, using and disseminating Plaintiff's and Class members' personal information, geolocation data, and communications.

226.   Defendant also engaged in a number of practices designed to perpetuate the scheme and the stream of revenue it generates. Those practices, which are unfair separately and particularly when taken together, include but are not limited to invasion of Plaintiff's and Class members' privacy; surreptitiously tracking Plaintiff's and Class members' location; surreptitiously accessing Plaintiff's and Class members' cellphones without authorization; surreptitiously obtaining personal data from Plaintiff's and Class members' cellphones; surreptitiously intercepting and recording Plaintiff's and Class members' communications.

First Amended Class Action Complaint                                      22-CV-01327 BAS-AHG

227.    Unfair acts under the UCL have been interpreted using three different tests: (1) whether the public policy which is a predicate to a consumer unfair competition action under the unfair prong of the UCL is tethered to specific constitutional, statutory, or regulatory provisions; (2) whether the gravity of the harm to the consumer caused by the challenged business practice outweighs the utility of the defendant's conduct; and (3) whether the consumer injury is substantial, not outweighed by any countervailing benefits to consumers or competition, and is an injury that consumers themselves could not reasonably have avoided. Defendant's conduct alleged is unfair under all of these tests.

228.    As a direct and proximate result of Defendant's unfair practices, Plaintiff and Class members were injured and suffered damages, a loss of privacy, and loss of the value of their personal information in an amount to be determined at trial.

229.    Plaintiff seeks to enjoin further unfair acts or practices by Defendant, to obtain restitution and disgorgement of all monies generated as a result of such practices, and for all other relief allowed under California Business & Professions Code §17200.

## COUNT SEVEN
### Unlawful Practices
### in Violation of the California Unfair Competition Law
### Cal. Bus. & Prof. Code §17200

230.    Plaintiff repeats, re-alleges, and incorporates by reference preceding paragraphs above as if fully set forth herein.

231.    At all relevant times there was in full force and effect the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §17200, *et seq.*, which prohibits, *inter alia*, "any *unlawful*, unfair, or fraudulent business act or practice" and "unfair, deceptive, untrue, or misleading advertising." Cal. Bus. & Prof. Code §17200 (emphasis supplied).

232.    In the course of their business, Defendant repeatedly and regularly engaged in unlawful acts or practices that imposed a serious harm on consumers, including Plaintiff and Class members.

233.   Defendant's acts and practices are unlawful because Defendant violated, and continues to violate:

A.   The Constitution of California, Article I, Section 1;

B.   The California Computer Data Access and Fraud Act;

C.   The California Invasion of Privacy Act, including Sections 631, 638.51, 632 and 632.7; and

D.   Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45.

234.   As a direct and proximate result of Defendant's unlawful practices, Plaintiff and Class members were injured and suffered damages, a loss of privacy, and loss of the value of their personal information in an amount to be determined at trial.

235.   Plaintiff seek to enjoin further unlawful acts or practices by Defendant, to obtain restitution and disgorgement of all monies generated as a result of such practices, and for all other relief allowed under California Business & Professions Code §17200.

**COUNT EIGHT**
**Unjust Enrichment**

236.   Plaintiff repeats, re-alleges, and incorporates by reference preceding paragraphs above as if fully set forth herein.

237.   Plaintiff and members of the Class conferred a benefit on Defendant through the use and dissemination of Plaintiff's and Class members' personal information, geolocation data, and communications.

238.   Defendant received and is in possession of Plaintiff's and Class members' personal information, geolocation data, and communications, which Defendant used and disseminated for its own monetary benefit.

239.   It is unjust under the circumstances for Defendant to retain the benefit conferred by Plaintiff and Class members without compensating them.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff David Greenley, individually and on behalf of all others similarly situated, requests that this Court:

First Amended Class Action Complaint                          22-CV-01327 BAS-AHG

A.    Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Class defined above;

B.    Appoint Plaintiff as the representative of the Class and his counsel as Class counsel;

C.    Award all actual, general, special, incidental, statutory, punitive, and consequential damages, treble damages, and restitution to which Plaintiffs and the Class members are entitled by law;

D.    Award pre-judgment and post-judgment interest on such monetary relief;

E.    Grant appropriate injunctive and/or declaratory relief, including, without limitation, an order that requires Defendant to disclose its practices collecting and disseminating personal information, data, and communications, and to refrain from collecting, retaining, using and disseminating Plaintiff's and Class members' personal information, geolocation data, and communications without disclosing the full extent of its practices;

F.    Award reasonable attorneys' fees and costs; and

G.    Grant such further relief that this Court deems appropriate.

## JURY DEMAND

Plaintiff, on behalf of himself and the putative Class demand a trial by jury on all issues so triable.

Date: November 21, 2022                    Respectfully submitted,

By: *s/ Joshua Swigart*
Joshua B. Swigart, Esq.
**SWIGART LAW GROUP**
2221 Camino del Rio S, Ste 308
San Diego, CA 92108
Telephone: 866-219-3343
Facsimile: 866-219-8344
*Josh@SwigartLawGroup.com*

54

Peter F. Barry (*Pro Hac Vice Pending*)
**THE BARRY LAW OFFICE, LTD**
333 Washington Ave No, Suite 300-9038
Minneapolis MN 55401-1353
Telephone: (612) 379-8800
*pbarry@lawpoint.com*

Daniel O. Herrera (*Admitted Pro Hac Vice*)
Nickolas J. Hagman (*Pro Hac Vice Pending*)
**CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP**
135 S. LaSalle, Suite 3210
Chicago, Illinois 60603
Telephone: (312) 782-4880
Facsimile: (312) 782-4485
*dherrera@caffertyclobes.com*
*nhagman@caffertyclobes.com*

John J. Nelson (SBN 317598)
**Milberg Coleman Bryson Phillips Grossman**
280 South Beverly Drive
90212
Beverly Hills, CA 90212
619-209-6941
Email: jnelson@milberg.com

*Attorneys for Plaintiff
and the Proposed Class*

# EXHIBIT 2

1  PACIFIC TRIAL ATTORNEYS
   A Professional Corporation
2  Scott J. Ferrell, Bar No. 202091
   sferrell@pacifictrialattorneys.com
3  4100 Newport Place Drive, Ste. 800
   Newport Beach, CA 92660
4  Tel: (949) 706-6464
   Fax: (949) 706-6469
5
6  Attorneys for Plaintiff

7

8              **UNITED STATES DISTRICT COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10

11  ANNETTE CODY, individually and on          Case No. 8:22-cv-1434
    behalf of all others similarly situated,
12
              Plaintiff,
13
              v.                                **CLASS ACTION COMPLAINT FOR**
14                                               **VIOLATION OF PENAL CODE § 631**
    BOSCOV'S, INC., a Pennsylvania
15  corporation; and DOES 1 through 25,
    inclusive,
16
              Defendants.
17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

1.     Plaintiff Annette Cody ("Plaintiff") brings this class action individually and on behalf of all other California citizens similarly situated against Defendant for its illegal wiretapping of all communications with Defendant's website, www.boscovs.com (the "Website").

2.     Unbeknownst to visitors to the Website, Defendant has secretly deployed "keystroke monitoring" software that Defendant uses to surreptitiously intercept, monitor, and record the communications (including keystrokes and mouse clicks) of all visitors to its Website.  Defendant neither informs visitors nor seeks their express or implied consent prior to this wiretapping.

3.     Defendant has violated the California Invasion of Privacy Act ("CIPA"), California Penal Code § 631, entitling Plaintiff and Class Members to relief pursuant thereto.

**JURISDICTION AND VENUE**

1.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. Section 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is at least minimal diversity because at least one Plaintiff and Defendant are citizens of different states.

2.     Pursuant to 28 U.S.C. Section 1391, this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District: Plaintiff is a citizen of California who resides in this District; Defendant conducted a substantial portion of the unlawful activity in this District; and Defendant conducts business in this District.

3.     Defendant is subject to personal jurisdiction in California based upon sufficient minimum contacts which exist between Defendant and California. Defendant also does businesss with  California residents.

**PARTIES**

4.     Plaintiff is an adult citizen of California residing within the Central District of California.

5.     Defendant is a Pennsylvania corporation.  Defendant affects commerce within the state of California and does business with California residents.

6.     The above-named Defendant, and its subsidiaries and agents, are collectively referred to as "Defendants."     The true names and capacities of the Defendants sued herein as DOE DEFENDANTS 1 through 25, inclusive, are currently unknown to Plaintiff, who therefore sues such Defendants by fictitious names. Each of the Defendants designated herein as a DOE is legally responsible for the unlawful acts alleged herein. Plaintiff will seek leave of Court to amend the Complaint to reflect the true names and capacities of the DOE Defendants when such identities become known.

7.     Plaintiff is informed and believes that at all relevant times, every Defendant was acting as an agent and/or employee of each of the other Defendants and was acting within the course and scope of said agency and/or employment with the full knowledge and consent of each of the other Defendants.

8.     Plaintiff is informed and believe that each of the acts and/or omissions complained of herein was made known to, and ratified by, each of the other Defendants.

**FACTUAL ALLEGATIONS**

9.     Without warning visitors or seeking their consent, Defendant has secretly deployed wiretapping software on its Website.  This software allows Defendant to surreptitiously record every aspect of a visitor's interaction with the Website, including keystrokes, mouse clicks, data entry and other electronic communications.

10.     Defendant's actions are the equivalent of an invasive digital trifecta: looking over consumers' shoulders, eavesdropping on consumers' conversations, and reading consumers' journals.  Defendant's conduct is both illegal and offensive: indeed, a recent study conducted by the Electronic Privacy Information Center, a respected thought leader regarding digital privacy, found that: (1) nearly 9 in 10 adults are "very

CLASS ACTION COMPLAINT

concerned" about data privacy, and (2) 75% of adults are unaware of the extent to which companies gather, store, and exploit their personal data. *See* https://archive.epic.org/privacy/survey/ (last downloaded August 2022).

11.     Within the past year, Plaintiff visited Defendant's Website.  Plaintiff communicated with someone that Plaintiff believed to be customer service representative.  In actuality, Defendant's Website utilizes a sophisticated "chatbot" program that convincingly impersonates an actual human that encourages consumers to share their personal information.  At the same time, the Defendant simultaneously logs, records and stores the entire conversation using secretly embedded wiretapping technology.

12.     Both the "chatbot" and "replay" technology were created by third party providers who license the technology to Defendant and with whom Defendant routinely shares the contents of the wiretapped communications for both storage an data harvesting purposes.

13.     Defendant did not inform Plaintiff, or any of the Class Members, that Defendant was secretly monitoring, recording, and sharing their communications.

14.     Defendant did not seek Plaintiff's or the Class Members' consent to monitoring, recording, and sharing the electronic communications with the Website.

15.     Plaintiff and Class Members did not know at the time of the communications that Defendant was secretly intercepting, monitoring, recording, and sharing the electronic communications.

## CLASS ALLEGATIONS

16.     Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class") defined as follows:

**All persons within California, who (1) within one year of the filing of this Complaint visited Defendant's website, and (2) whose electronic communications were recorded or shared with third parties by Defendant without their prior, express consent.**

17.   <u>NUMEROSITY</u>: Plaintiff does not know the number of Class Members but believes the number to be in the tens of thousands, if not more. The exact identities of Class Members may be ascertained by the records maintained by Defendant.

18.   <u>COMMONALITY</u>: Common questions of fact and law exist as to all Class Members, and predominate over any questions affecting only individual members of the Class.  Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class Member, include but are not limited to the following:

      a. Whether Defendant caused Plaintiff's and the Class's electronic communications with the Website to be recorded, intercepted and/or monitored;

      b. Whether Defendant violated CIPA based thereon;

      c. Whether Plaintiff and Class Members are entitled to statutory damages pursuant to Cal. Penal Code § 631(a);

      d. Whether Plaintiff and Class Members are entitled to punitive damages pursuant to Cal. Civil Code § 3294; and

      e. Whether Plaintiff and Class Members are entitled to injunctive relief.

19.   <u>TYPICALITY</u>: As a person who visited Defendant's Website and had her electronic communications recorded, intercepted and monitored, Plaintiff is asserting claims that are typical to the Class.

20.   <u>ADEQUACY</u>: Plaintiff will fairly and adequately protect the interests of the members of The Class. Plaintiff has retained attorneys experienced in the class action litigation.  All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

21.   <u>SUPERIORITY</u>: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient.  Even if every Class Member could afford individual

litigation, the court system could not.  It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.

## CAUSE OF ACTION

### Violations of the California Invasion of Privacy Act

### Cal. Penal Code § 631

22.     Section 631(a) of California's Penal Code prohibits and imposes liability upon any entity that "by means of any machine, instrument, contrivance, or in any other manner," (1) "intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system," or (2) "willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state" or (3) "uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section".

*23.*     Section 631 of the California Penal Code applies to internet communications and thus applies to Plaintiff's and the Class's electronic communications with Defendant's Website.  ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.  It makes liable anyone who 'reads, or attempts to read, or to learn the contents' of a communication 'without the consent of all parties to the communication.'  Cal. Penal Code § 631(a)."  *Javier v. Assurance IQ, LLC*, 21-16351, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022).

24.     The software employed by Defendant on its Website to record Plaintiff's and the Class's electronic communications qualifies as a "machine, instrument,

contrivance, or … other manner" used to engage in the prohibited conduct alleged herein.

25.    At all relevant times, Defendant intentionally caused the internet communication between Plaintiff and Class Members with Defendant's website to be tapped and recorded.

26.    At all relevant times, Defendant willfully, and without the consent of all parties to the communication, caused to be intercepted, read or attempted to be read, logged, and stored, the contents of electronic communications of Plaintiff and Class Members with its Website, while the electronic communications were in transit over any wire, line or cable, or were being sent from or received at any place within California.

27.    Plaintiff and Class Members did not consent to any of Defendant's actions in implementing wiretaps on its Website, nor did Plaintiff or Class Members consent to Defendant's intentional access, interception, recording, monitoring, reading, learning and collection of Plaintiff and Class Members' electronic communications with the Website.

28.    Defendant's conduct constitutes numerous independent and discreet violations of Cal. Penal Code § 631(a), entitling Plaintiff and Class Members to injunctive relief and statutory damages of at least $2,500.00 per violation.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief against Defendant:

1.    An order certifying the Class, naming Plaintiff as the representative of the Class and Plaintiff's attorneys as Class counsel;

2.    An order declaring Defendant's conduct violates CIPA;

3.    An order of judgment in favor of Plaintiff and the Class and against Defendant on the cause of action asserted herein;

4.    An order enjoining Defendant's conduct as alleged herein and any other injunctive relief that the Court finds proper;

5.    Statutory damages to Plaintiff and the Class pursuant to Cal. Penal Code § 631(a);

6.    Punitive damages to Plaintiff and the Class pursuant to Cal. Civil Code § 3294;

7.    Prejudgment interest;

8.    Reasonable attorneys' fees and costs; and

9.    All other relief that would be just and proper as a matter of law or equity, as determined by the Court.

Dated:  August 2, 2022              PACIFIC TRIAL ATTORNEYS, APC

                                    By:_____
                                    Scott. J. Ferrell
                                    Attorneys for Plaintiff

# EXHIBIT 3

PACIFIC TRIAL ATTORNEYS
A Professional Corporation
Scott J. Ferrell, Bar No. 202091
sferrell@pacifictrialattorneys.com
David W. Reid, Bar No. 267382
dreid@pacifictrialattorneys.com
Victoria C. Knowles, Bar No. 277231
vknowles@pacifictrialattorneys.com
4100 Newport Place Drive, Ste. 800
Newport Beach, CA  92660
Tel: (949) 706-6464
Fax: (949) 706-6469

Attorneys for Plaintiff and Proposed Class

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANNETTE CODY, individually and on behalf of all others similarly situated,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>LACOSTE USA, INC., a Delaware corporation; and DOES 1 through 25, inclusive,<br><br>　　　　Defendants. | Case No. 8:23-cv-235<br><br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF PENAL CODE § 631 et seq.** |

## INTRODUCTION

Defendant (1) covertly wiretaps the personal conversations of all visitors who utilize the chat feature at www.lacoste.com; and (2) allows at least one third party to eavesdrop on such communications in real time and during transmission to harvest data for financial gain.

Defendant does not obtain visitors' consent to either the wiretapping or the eavesdropping.   As a result, Defendant has violated the California Invasion of Privacy Act ("CIPA") in numerous ways.

## JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. Section 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is at least minimal diversity because at least one Plaintiff and Defendant are citizens of different states. Indeed, based upon the information available to Plaintiff, there are believed to be at least 5,000 class members, each entitled to $5,000 in statutory damages, thus making the amount in controversy at least $25,000,0000 exclusive of interests and costs.

2.     Pursuant to 28 U.S.C. § 1391, venue is proper because a substantial part of the acts and events giving rise to the claims occurred in this District.

3.     Defendant is subject to personal jurisdiction because it has sufficient minimum contacts with California and it does business with California residents.

## PARTIES

4.     Plaintiff is a resident and citizen of California.

5.     Defendant is a Delaware corporation that owns, operates, and/or controls the above-referenced website.

6.     The above-named Defendant, along with its affiliates and agents, are collectively referred to as "Defendants."   The true names and capacities of the Defendants sued herein as DOE DEFENDANTS 1 through 25, inclusive, are currently

unknown to Plaintiff, who therefore sues such Defendants by fictitious names. Each of the Defendants designated herein as a DOE is legally responsible for the unlawful acts alleged herein. Plaintiff will seek leave of Court to amend the Complaint to reflect the true names and capacities of the DOE Defendants when such identities become known.

7.     Plaintiff is informed and believes that at all relevant times, every Defendant was acting as an agent and/or employee of each of the other Defendants and was acting within the course and scope of said agency and/or employment with the full knowledge and consent of each of the other Defendants.

8.     Plaintiff is informed and believe that each of the acts and/or omissions complained of herein was made known to, and ratified by, each of the other Defendants.

## FACTUAL ALLEGATIONS

9.     The California Invasion of Privacy Act ("CIPA") prohibits both wiretapping and eavesdropping of electronic communications without the consent of all parties to the communication.  Compliance with CIPA is easy, and the vast majority of website operators comply by conspicuously warning visitors when their conversations are being recorded or if third parties are eavesdropping on them.[1]

10.     Unlike most companies, Defendant *ignores* CIPA.  Instead, Defendant both **wiretaps** the conversations of all website visitors and allows a third party to **eavesdrop** on the conversations in real time during transmission.  Why?  Because, as one industry expert notes, "*Live chat transcripts are the gold mines of customer service.  At your fingertips, you have valuable customer insight. . .***When people are chatting, you have direct access to their exact pain points.***"*). *See* https://www.ravience.co/post/improve-marketing-roi-live-chat-transcripts (last downloaded January 2023).

11.     Defendant's wiretapping and eavesdropping are not incidental to the act of facilitating e-commerce, nor are they undertaken in the ordinary course of business. To

---

[1]     *See* www.leechtishman.com/insights/blog ("*CIPA Compliance is not difficult. A business must take certain steps. . .with a chat feature. . .to ensure that it obtains valid consent consistent with the holdings of courts interpreting CIPA.*") (last downloaded January 2023).

1    the contrary, Defendant's actions violate both industry norms and the legitimate

2    expectations of consumers.[2]

3         12.    To enable the **wiretapping**, Defendant has covertly embedded code into its

4    chat feature that automatically records and creates transcripts of all such conversations.

5    To enable the **eavesdropping**, Defendant allows at least one independent third-party

6    vendor to secretly intercept (during transmission and in real time), eavesdrop upon, and

7    store transcripts of Defendant's chat communications with unsuspecting website visitors

8    – even when such conversations are private and deeply personal.

9         13.    Defendant neither informed visitors of this conduct nor obtained their

10   consent to these intrusions.

11        14.    Given the nature of Defendant's business, visitors often share highly

12   sensitive personal data with Defendant via the website chat feature.  As noted above,

13   visitors would be shocked and appalled to know that Defendant secretly records those

14   conversations, and would be even more troubled to learn that Defendant allows a third

15   party to eavesdrop on the conversations in real time and then harvest the data to

16   monetize under the guise of "data analytics."

17        15.    Defendant's conduct is illegal, offensive, and contrary to visitor

18   expectations: indeed, a recent study conducted by the Electronic Privacy Information

19   Center, a respected thought leader regarding digital privacy, found that: (1) nearly 9 in

20   10 adults are "very concerned" about data privacy, and (2) 75% of adults are unaware of

21   the extent to which companies gather, store, and exploit their personal data.

22        16.    Plaintiff is a consumer privacy advocate with dual motivations for

23   initiating a conversation with Defendant.  First, Plaintiff was genuinely interested in

24   learning more about the goods and services offered by Defendant.  Second, Plaintiff is a

25   "tester" who works to ensure that companies like Defendant abide by the strict privacy

26

27   [2]   According to a recent poll, nearly eight in ten Americans believe that companies do not collect or share consumer data
     gathered online, while about seven in ten believe that they remain anonymous when engaged in online activities like web

28   browsing and chatting.  *See* https://www.ipsos.com/en-us/news-polls/data-privacy-2023 (last downloaded January 2023).

obligations imposed upon them by California law. As someone who advances important public interests at the risk of vile personal attacks, Plaintiff should be "praised rather than vilified." *Murray v. GMAC Mortgage Corp.*, 434 F.3d 948, 954 (7th Cir. 2006).[3]

17. In enacting CIPA, the California legislature intentionally chose to extend its protections to all "persons" utilizing public telephone lines. Indeed, because they expressly extend protection to persons beyond "bona fide patrons" or individuals who suffer pecuniary loss, statutes like CIPA are largely enforced by "testers" such as Plaintiff. *See Tourgeman v. Collins Fin. Servs.*, Inc., 755 F.3d 1109 (9th Cir. 2014) (explaining why testers have Article III standing and generally discussing value and importance of testers in enforcement of consumer protection and civil rights statutes).

18. Within the statute of limitations period, Plaintiff visited Defendant's Website. Plaintiff used a smart phone (a cellular telephones with an integrated computer to enable web browsing) and had a conversation with Defendant. As such, Plaintiff's communications with Defendant were transmitted from a "cellular radio telephone" as defined by CIPA.

19. By definition, Defendant's chat communications from its website are transmitted to website visitors by telephony subject to the mandates of CIPA. *See* https://www.britannica.com/technology/Internet ("*The Internet works through a series of networks that connect devices around the world through telephone lines.*") (last downloaded January 2023).

---

[3] American civil rights hero Rosa Parks was acting as a litigation "tester" when she initiated the Montgomery Bus Boycott in 1955, as she voluntarily subjected herself to an unlawful practice in order to obtain standing to challenge the practice. *See* https://www.naacpldf.org/press-release/ldf-pays-tribute-to-rosa-parks-on-the-sixtieth-anniversary-of-her-courageous-stand-against-segregation/ "(*Contrary to popular myth, Rosa Parks was not just a tired seamstress who merely wanted to sit down on a bus seat that afternoon. She refused to give up her seat on principle. Parks had long served as the secretary of the Montgomery branch of the NAACP. Challenging segregation in Montgomery's transportation system was on the local civil rights agenda for some time.*") (last downloaded January 2023).

CLASS ACTION COMPLAINT

20.     Defendant did not inform Plaintiff or Class Members that Defendant was secretly recording their conversations or allowing, aiding, and abetting a third party to intercept and eavesdrop on them in real time.  Plaintiff did not learn that Defendant secretly recorded the conversations or allowed a third party to eavesdrop upon it until after the conversation was completed and additional, highly technical research was completed.

21.     Defendant did not obtain Class Members' express or implied consent to wiretap or allow third parties to eavesdrop on visitor conversations, nor did Class Members know at the time of the conversations that Defendant was secretly wiretapping them and allowing third parties to eavesdrop on them.

22.     The allegations herein have already been found to be sufficient to stage viable claims for violation of CIPA in a materially identical matter.  *See Byars, et al v. Goodyear Tire & Rubber Company*, Central District of California Case No. 5:22-cv-01358 (denying a Motion to Dismiss brought pursuant to F.R.C.P. 12(b)(6), holding that Plaintiff has "pled sufficient facts to state both a §631(a) and a  §632.7 claim.").

## CLASS ALLEGATIONS

23.     Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class") defined as follows:

> **All persons within California who: (1) visited Defendant's website, and (2) whose electronic communications were recorded, stored, and/or shared by Defendant without prior express consent within the statute of limitations period.**

24.     <u>NUMEROSITY</u>: Plaintiff does not know the number of Class Members but believes the number to be in the tens of thousands, if not more. The exact identities of Class Members may be ascertained by the records maintained by Defendant.

25.     <u>COMMONALITY</u>: Common questions of fact and law exist as to all Class Members, and predominate over any questions affecting only individual members of the Class.  Such common legal and factual questions, which do not vary between Class

members, and which may be determined without reference to the individual circumstances of any Class Member, include but are not limited to the following:

a. Whether Defendant caused Plaintiff's and the Class's electronic communications with the Website to be recorded, intercepted and/or monitored;

b. Whether Defendant violated CIPA based thereon;

c. Whether Plaintiff and Class Members are entitled to statutory damages pursuant to Cal. Penal Code § 631(a);

d. Whether Plaintiff and Class Members are entitled to punitive damages pursuant to Cal. Civil Code § 3294; and

e. Whether Plaintiff and Class Members are entitled to injunctive relief.

26. <u>TYPICALITY</u>: As a person who visited Defendant's Website and whose electronic communication was recorded, intercepted and monitored, Plaintiff is asserting claims that are typical to the Class.

27. <u>ADEQUACY</u>: Plaintiff will fairly and adequately protect the interests of the members of The Class. Plaintiff has retained attorneys experienced in the class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

28. <u>SUPERIORITY</u>: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.

## **FIRST CAUSE OF ACTION**

### **Violations of the California Invasion of Privacy Act**

### **Cal. Penal Code § 631**

29. Section 631(a) of California's Penal Code imposes liability upon any entity that "by means of any machine, instrument, contrivance, or in any other manner," (1)

"intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system," or (2) "willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state" or (3) "uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section". Here, Defendant does all three.

30. Section 631 of the California Penal Code applies to internet communications and thus applies to Plaintiff's and the Class's electronic communications with Defendant's Website. "Though written in terms of wiretapping, Section 631(a) applies to Internet communications. It makes liable anyone who 'reads, or attempts to read, or to learn the contents' of a communication 'without the consent of all parties to the communication.' *Javier v. Assurance IQ, LLC*, 2023 WL 1744107, at *1 (9th Cir. 2023).

31. The software embedded on Defendant's Website to record and eavesdrop upon the Class's communications qualifies as a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct alleged herein.

32. At all relevant times, Defendant intentionally caused the internet communication between Plaintiff and Class Members with Defendant's Website to be recorded. Defendant also aided, abetted at least one third party to eavesdrop upon such conversations during transmission and in real time.

33. Plaintiff and Class Members did not expressly or impliedly consent to any of Defendant's actions.

34. Defendant's conduct constitutes numerous independent and discreet violations of Cal. Penal Code § 631(a), entitling Plaintiff and Class Members to injunctive relief and statutory damages.

## SECOND CAUSE OF ACTION

### Violations of the California Invasion of Privacy Act

### Cal. Penal Code § 632.7

35. Section 632.7 of California's Penal Code imposes liability upon anyone "who, without the consent of all parties to a communication, intercepts or receives and intentionally records, or assists in the interception or reception and intentional recordation of, a communication transmitted between two cellular radio telephones, a cellular radio telephone and a landline telephone, two cordless telephones, a cordless telephone and a landline telephone, or a cordless telephone and a cellular radio telephone." As summarized by the California Supreme Court in *Smith v. Loanme*, under section 632.7(a) it is a crime when a person intercepts or records "a communication transmitted between a cellular or cordless telephone and another telephone." Stated differently, only one party to the conversation needs to be using a cellular phone for the prohibitions of Section 632.7 to apply.

36. Section 632.7 defines "Communication" exceptionally broadly – including not only voice communication, but also communications transmitted by "data, or image, including facsimile." Text messages sent from a smart phone to a computer or internet, like the messages at issue here, are considered data transmissions via cellular telephony to landline telephony, thus subject to Section 632.7. *See* https://www.techtarget.com/searchmobilecomputing/definition/texting ("*Text messaging is the act of sending short, alphanumeric communications between cellphones, pagers or other hand-held devices, as implemented by a wireless carrier. . . **Users can also send text messages from a computer to a hand-held device. Web texting, as it's called, is made possible by websites called SMS gateways.**"*) (last downloaded January 2023).

37.     The prohibitions set forth in Section 637.2 "apply to all communications, not just confidential communications." *Kearney v. Salomon Smith Barney*, *Inc.* (2006) 39 Cal.4th 95, 122.

38.     Plaintiff and the class members communicated with Defendant using telephony subject to the mandates and prohibitions of Section 632.7.

39.     Defendant's communication from the chat feature on its website is transmitted via telephony subject to the mandates and prohibitions of Section 632.7.

40.     As set forth above, Defendant recorded telephony communication without the consent of all parties to the communication in violation of Section 632.7.

41.     As set forth above, Defendant also aided and abetted a third party in the interception, reception, and/or intentional recordation of telephony communication in violation of Section 632.7.

42.     Defendant's conduct constitutes numerous independent and discreet violations of Cal. Penal Code § 632.7, entitling Plaintiff and Class Members to injunctive relief and statutory damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief against Defendant:

1.     An order certifying the Class, naming Plaintiff as the representative of the Class and Plaintiff's attorneys as Class counsel;

2.     An order declaring Defendant's conduct violates CIPA;

3.     An order of judgment in favor of Plaintiff and the Class and against Defendant on the causes of action asserted herein;

4.     An order enjoining Defendant's conduct as alleged herein and any other injunctive relief that the Court finds proper;

5.     Statutory damages pursuant to CIPA;

6.     Punitive damages;

7.     Prejudgment interest;

8.     Reasonable attorneys' fees and costs; and

CLASS ACTION COMPLAINT

9.     All other relief that would be just and proper as a matter of law or equity, as determined by the Court.

Dated:  February 7, 2023                    PACIFIC TRIAL ATTORNEYS, APC

                                            By:_____
                                            Scott. J. Ferrell
                                            Attorneys for Plaintiff

# EXHIBIT 4

1    PACIFIC TRIAL ATTORNEYS
     A Professional Corporation
2    Scott J. Ferrell, Bar No. 202091
     sferrell@pacifictrialattorneys.com
3    4100 Newport Place Drive, Ste. 800
     Newport Beach, CA 92660
4    Tel: (949) 706-6464
     Fax: (949) 706-6469
5

6    Attorneys for Plaintiff

7

**Electronically FILED by
Superior Court of California,
County of Los Angeles
11/17/2023 5:51 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By S. Trinh, Deputy Clerk**

8           **SUPERIOR COURT FOR THE STATE OF CALIFORNIA**

9                  **COUNTY OF LOS ANGELES**

10

11    MILTITA CASILLAS, individually and on behalf    Case No. 23STCV28330
     of all others similarly situated,

12

13          Plaintiffs,                **CLASS ACTION COMPLAINT FOR
VIOLATION OF CALIFORNIA PENAL
CODE SECTION 638.51**

14          v.

15    SLEEP NUMBER CORPORATION, a Delaware
     entity d/b/a WWW.SLEEPNUMBER.COM,

16          Defendant.

17

18

19

20

21

22

23

24

25

26

27

28

## I.   **INTRODUCTION**

To learn the identity of anonymous visitors to www.sleepnumber.com (the "Website") and monetize its knowledge of those visitor and their online habits, Defendant has secretly deployed spyware that accesses visitor devices, installs tracking software, and surveils their browsing habits.

Plaintiff visited Defendant's website in 2023 using a mobile device. Without Plaintiff's knowledge or consent, Defendant secretly used "pen register" software to access Plaintiff's device and install tracking software in violation of California law.

## II.   **JURISDICTION AND VENUE**

1. Defendant is subject to jurisdiction in this state under Penal Code section 502(j), which provides that a person who accesses a computer from another jurisdiction is deemed to have personally accessed the computer in California. Plaintiff was in California when Defendant accessed Plaintiff's device and installed tracking code.

2. Defendant is also subject to jurisdiction under California's "long-arm" statute found at California Code of Civil Procedure section 410.10 because the exercise of jurisdiction over Defendant is not "inconsistent with the Constitution of this state or the United States." Indeed, Plaintiff believes that Defendant generates a minimum of eight percent of revenues from its website based upon interactions with Californians (including instances in which the website operates as a "gateway" to sales), such that the website "is the equivalent of a physical store in California." Since this case involves illegal conduct emanating from Defendant's operation of its website targeting Californians, California courts can "properly exercise personal jurisdiction" over the Defendant in accordance with the Court of Appeal opinion in *Thurston v. Fairfield Collectibles of Georgia*, 53 Cal.App.5th 1231 (2020).

3. Venue is proper in this County pursuant to California Code of Civil Procedure section 394(b) because "none of the defendants reside in the state", such that venue is proper "in any county that the plaintiff may designate."

## III.   **PARTIES**

4. Plaintiff is a resident of California. Plaintiff is also a consumer privacy advocate who works as a "tester" to ensure that companies abide by the privacy obligations imposed by California law. As an individual who advances important public interests at the risk of vile personal attacks,

1    Plaintiff should be "praised rather than vilified." *See Murray v. GMAC Mortgage Corp*., 434 F.3d 948,

2    954 (7th Cir. 2006). Indeed, the Ninth Circuit recently made exceptionally clear that it is "necessary

3    and desirable for committed individuals to bring serial litigation" to enforce and advance consumer

4    protection statutes, and that Courts must not make any impermissible credibility or standing inferences

5    against them. *Langer v. Kiser*, 57 F.4th 1085, 1095 (9th Cir. 2023).

6          5.     Defendant is a specialty bedding company that sells products throughout California and

7    in this County.

8                          **IV.    FACTUAL ALLEGATIONS**

9    **A.    The Right to Privacy Has Always Been a Legally Protected Interest in the United States.**

10          6.     Since America's founding, privacy has been a legally protected interest at the local, state,

11   and federal levels. *See Patel v. Facebook, Inc.*, 932 F.3d 1264, 1271–72 (9th Cir. 2019) (quoting *Spokeo,*

12   *Inc. v. Robins*, 578 U.S. 330, 341 (2016)) ("Privacy rights have long been regarded 'as providing a basis

13   for a lawsuit in English or American courts.'"); and *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th

14   Cir. 2017) ("Violations of the right to privacy have long been actionable at common law.").

15          7.     More specifically, privacy protections against the disclosure of personal information are

16   embedded in California statutes and at common law. *See e.g.*, *U.S. Dep't of Justice v. Reporters Comm.*

17   *for Freedom of the Press*, 489 U.S. 749, 763 (1989) ("The Ninth Circuit has repeatedly held that privacy

18   intrusions may constitute "concrete injury" for purposes of Article III standing); *Van Patten v. Vertical*

19   *Fitness Grp., LLC*, 847 F.3d 1037, 1041–43 (9th Cir. 2017) (finding "concrete injury" where plaintiffs

20   claimed that unsolicited telemarketing calls "invade the privacy and disturb the solitude of their

21   recipients*"); In re Facebook, Inc. Internet Tracking Litig*., 956 F.3d 589, 599 (9th Cir. 2020) (finding

22   "concrete injury" where Facebook allegedly tracked users' "personally identifiable browsing history"

23   on third party websites); *Patel*, 932 F.3d at 1275 (finding "concrete injury" where plaintiffs claimed

24   Facebook's facial-recognition technology violated users' privacy rights).

25          8.     In short, the privacy of personal information is—and has always been—a legally

26   protected interest in many contexts. Thus, a defendant whose acts or practices violate consumer privacy

27   inflicts an actionable "injury" upon an individual.

28

**B.      Defendant Secretly Installs Tracking Software on the Devices of All Visitors To Its Website In Violation of California Law.**

9.      Every device connected to the internet has a unique IP address, typically consisting of a sequence of numbers. *See United States v. Caira*, 833 F.3d 803, 805 (7th Cir. 2016). An IP address "is used to route information between devices." *United States v. Ulbricht*, 858 F.3d 71, 84 (2d Cir. 2017).

10.      Once linked to a particular individual, a unique IP address can be used to compile a detailed picture of an individual's online activities, including: the online services for which an individual has registered; personal interests based on websites visited; organizational affiliations; where the individual has been physically; a person's political and religious affiliations; individuals with whom they have leanings and with whom they associate; and where they travel, among other things. *See* https://www.priv.gc.ca/en/opc-actions-and-decisions/research/explore-privacy-research/2013/ip_201305/ (last downloaded November 2023).

11.      For the preceding reasons, the ability to link an IP address to a particular individual is of great monetary value and has created an entire industry known as "identity resolution."  Identity resolution is generally defined as "the ability to recognize an individual person, in real-time, by connecting various identifiers from their digital interactions across devices and touchpoints."  *See* https://www.fullcontact.com/identity-resolution/ (last visited November 2023).

12.      The technical means by which an IP address is linked to a particular individual is via deployment of "pen register" software.  Traditionally, law enforcement used "pen registers" in investigations to record all numbers called from a particular telephone, and "pen registers" required physical machines. Today, pen registers take the form of software.  *See In re Order Authorizing Prospective & Continuous Release of Cell Site Location Recs.*, 31 F.Supp.3d 889, 898 n.46 (S.D. Tex. 2014) (citing Susan Freiwald, *Uncertain Privacy: Communication Attributes After the Digital Telephony Act*, 69 S. Cal. L. Rev. 949, 982-89 (1996) (describing the evolution of the pen register from mechanical device to computer code)).

13.      The following graphic shows how a website deploying pen register software to capture the IP address of visitors can identify anonymous website visitors and a great deal of personal information about their lives and habits:

14.     In the above example, a "pen register" has been used to capture an anonymous user's IP address and compare it to previously aggregated "touchpoints" to reveal the following details about a website visitor:

     (a) Full name (*Mary Smith*)

     (b) Date of birth (*May 1, 1979*)

     (c) Gender (*female*)

     (d) Home address (*2345 Avenue C, Papillion Nebraska*)

     (e) Marital Status and Family (*Married with two children*)

     (f) E-mail address (Mary.Smith@gmail.com)

     (g) Personal Cell Phone: (*111) 123-4567*

     (h) Voter Registration Status (*Registered*)

     (i) Interests (*Shopping, Cooking, Traveling, Reading, Science*)

     (j) Employer (*Karen's Fireside, Inc.*)

     (k) Title (*Vice President*)

     (l) Work Hours (*Daily 9-5*)

15.     Because of the massive privacy implications, California law prohibits the deployment of pen register software without first obtaining a court order. Cal. Penal Code § 638.51 ("CIPA Section

638.51").  CIPA defines a "pen register" broadly to include "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." *Id.* § 638.50(b).  *See Greenley v. Kochava*, 2023 WL 4833466, at *15-*16 (S.D. Cal. July 27, 2023) ("the Court rejects the contention that a private company's surreptitiously embedded software installed in a telephone cannot constitute a "pen register.").  CIPA imposes civil liability and statutory penalties for the installation of pen register software without a court order.  *Id.*

16.     Defendant knowingly and intentionally deployed "pen register" software on its website to decode routing, addressing, and signaling information to obtain the IP address of each visitor as part of Defendant's identity resolution efforts in violation of California law.  In response to an appropriate request, Plaintiff will share with Defendant proof of the deployment and activity of the pen register.

17.     Defendant used the pen register software to access Plaintiff's device and install tracking code on Plaintiff's device in violation of California law.  *See Greenley v. Kochava,* 2023 WL 4833466, at *15-*16 (S.D. Cal. July 27, 2023).  Defendant did not obtain Plaintiff's knowing and informed consent to do so, nor did Defendant obtain a court order authorizing it to do so.

## V.     <u>CLASS ACTION ALLEGATIONS</u>

18.     Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class") defined as follows:

> **All persons within the state of California who visited Defendants website within the statute of limitations period and whose privacy was violated as described above.**

19.     NUMEROSITY: Plaintiff does not know the number of Class Members but believes the number to be at least 100.  The exact identities of Class Members may be ascertained by the records maintained by Defendant.

20.     COMMONALITY: Common questions of fact and law exist as to all Class Members, and predominate over any questions affecting only individual members of the Class.

21.     TYPICALITY: As a person who visited Defendant's Website and whose privacy was invaded, Plaintiff is asserting claims that are typical of the Class.

CLASS ACTION COMPLAINT

22.     ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of The Class. Plaintiff has retained attorneys experienced in class action litigation.  All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

23.     SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient.

## VI.     CAUSE OF ACTION

## CALIFORNIA INVASION OF PRIVACY ACT

## PENAL CODE SECTION 638.51

24.     Section 638.51 of the Penal Code provides that it is illegal to "install or use a pen register or a trap and trace device without first obtaining a court order pursuant to Section 638.52 or 638.53." (Penal Code § 638.51(a).)  A "'Pen register' means a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication.  (Penal Code § 638.50(b).)

25.     Defendant knowingly and criminally deployed pen register software to access Plaintiff's device, install tracking software, and obtain Plaintiff's IP address.  *See Greenley v. Kochava*, 2023 WL 4833466, at *15-*16 (S.D. Cal. July 27, 2023) (Bashant, J.).  Plaintiff did not consent to Defendant's actions.

26.     Plaintiff suffered both an economic injury and an intangible injury to Plaintiff's dignity caused by the violation of Plaintiff's right to privacy.

27.     By knowingly violating a criminal statute and illegally accessing Plaintiff's device to install tracking software, Defendant acted with oppression and malice.  As such, Defendant is liable for punitive damages pursuant to Civil Code section 3294.

28.     Plaintiff is also entitled to statutory damages of $5,000.  *See* Penal Code § 637.2(a)(1).

29.     The class members suffered the same intrusion and are entitled to the same damages as Plaintiff.

1    **PRAYER FOR RELIEF**

2        WHEREFORE, Plaintiff seeks judgment against Defendant as follows:

3    a.    An order certifying the class and making appropriate case management orders therewith;

4    b.    For statutory damages, punitive damages, attorneys' fees; and

5    c.    For any and all other relief at law that may be appropriate.

6

7    Dated:  November 17, 2023                PACIFIC TRIAL ATTORNEYS, APC

8                                             By:_____

9                                             Scott. J. Ferrell
                                              Attorneys for Plaintiff
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 5

1  PACIFIC TRIAL ATTORNEYS
   A Professional Corporation
2  Scott J. Ferrell, Bar No. 202091
   sferrell@pacifictrialattorneys.com
3  4100 Newport Place Drive, Ste. 800
   Newport Beach, CA  92660
4  Tel: (949) 706-6464
   Fax: (949) 706-6469
5
   Attorneys for Plaintiff
6

7

Electronically FILED by
Superior Court of California,
County of Los Angeles
11/17/2023 4:37 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By S. Trinh, Deputy Clerk

8              SUPERIOR COURT FOR THE STATE OF CALIFORNIA

9                        COUNTY OF LOS ANGELES

10

11  MILTITA CASILLAS, individually and on behalf    Case No. 23STCV28343
    of all others similarly situated,
12
                    Plaintiffs,              **CLASS ACTION COMPLAINT FOR
13                                           VIOLATION OF CALIFORNIA PENAL
                    v.                       CODE SECTION 638.51**
14
    ZAPPOS.COM LLC,  a Delaware entity
15  d/b/a WWW.ZAPPOS.COM,

16                  Defendant.

17

18

19

20

21

22

23

24

25

26

27

28

---

CLASS ACTION COMPLAINT

## I.    INTRODUCTION

To learn the identity of anonymous visitors to www.zappos.com (the "Website") and monetize its knowledge of those visitor and their online habits, Defendant has secretly deployed spyware that accesses visitor devices, installs tracking software, and surveils their browsing habits.

Plaintiff visited Defendant's website in 2023 using a mobile device.  Without Plaintiff's knowledge or consent, Defendant secretly used "pen register" software to access Plaintiff's device and install tracking software in violation of California law.

## II.    JURISDICTION AND VENUE

1.    Defendant is subject to jurisdiction in this state under Penal Code section 502(j), which provides that a person who accesses a computer from another jurisdiction is deemed to have personally accessed the computer in California.  Plaintiff was in California when Defendant accessed Plaintiff's device and installed tracking code.

2.    Defendant is also subject to jurisdiction under California's "long-arm" statute found at California Code of Civil Procedure section 410.10 because the exercise of jurisdiction over Defendant is not "inconsistent with the Constitution of this state or the United States."  Indeed, Plaintiff believes that Defendant generates a minimum of eight percent of revenues from its website based upon interactions with Californians (including instances in which the website operates as a "gateway" to sales), such that the website "is the equivalent of a physical store in California."  Since this case involves illegal conduct emanating from Defendant's operation of its website targeting Californians, California courts can "properly exercise personal jurisdiction" over the Defendant in accordance with the Court of Appeal opinion in *Thurston v. Fairfield Collectibles of Georgia*, 53 Cal.App.5th 1231 (2020).

3.    Venue is proper in this County pursuant to California Code of Civil Procedure section 394(b) because "none of the defendants reside in the state", such that venue is proper "in any county that the plaintiff may designate."

## III.    PARTIES

4.    Plaintiff  is a resident of California.  Plaintiff is also a consumer privacy advocate who works as a "tester" to ensure that companies abide by the privacy obligations imposed by California law.  As an individual who advances important public interests at the risk of vile personal attacks,

CLASS ACTION COMPLAINT

Plaintiff should be "praised rather than vilified." *See Murray v. GMAC Mortgage Corp.*, 434 F.3d 948, 954 (7th Cir. 2006). Indeed, the Ninth Circuit recently made exceptionally clear that it is "necessary and desirable for committed individuals to bring serial litigation" to enforce and advance consumer protection statutes, and that Courts must not make any impermissible credibility or standing inferences against them. *Langer v. Kiser*, 57 F.4th 1085, 1095 (9th Cir. 2023).

5.   Defendant is an online fashion retailer based in Nevada that sells products throughout California and in this County.

## IV.   FACTUAL ALLEGATIONS

**A.   The Right to Privacy Has Always Been a Legally Protected Interest in the United States.**

6.   Since America's founding, privacy has been a legally protected interest at the local, state, and federal levels. *See Patel v. Facebook, Inc.*, 932 F.3d 1264, 1271–72 (9th Cir. 2019) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)) ("Privacy rights have long been regarded 'as providing a basis for a lawsuit in English or American courts.'"); and *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017) ("Violations of the right to privacy have long been actionable at common law.").

7.   More specifically, privacy protections against the disclosure of personal information are embedded in California statutes and at common law. *See e.g.*, *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 763 (1989) ("The Ninth Circuit has repeatedly held that privacy intrusions may constitute "concrete injury" for purposes of Article III standing); *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1041–43 (9th Cir. 2017) (finding "concrete injury" where plaintiffs claimed that unsolicited telemarketing calls "invade the privacy and disturb the solitude of their recipients"); *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 599 (9th Cir. 2020) (finding "concrete injury" where Facebook allegedly tracked users' "personally identifiable browsing history" on third party websites); *Patel*, 932 F.3d at 1275 (finding "concrete injury" where plaintiffs claimed Facebook's facial-recognition technology violated users' privacy rights).

8.   In short, the privacy of personal information is—and has always been—a legally protected interest in many contexts. Thus, a defendant whose acts or practices violate consumer privacy inflicts an actionable "injury" upon an individual.

**B.**     **Defendant Secretly Installs Tracking Software on the Devices of All Visitors To Its Website In Violation of California Law.**

9.     Every device connected to the internet has a unique IP address, typically consisting of a sequence of numbers. *See United States v. Caira*, 833 F.3d 803, 805 (7th Cir. 2016). An IP address "is used to route information between devices." *United States v. Ulbricht*, 858 F.3d 71, 84 (2d Cir. 2017).

10.     Once linked to a particular individual, a unique IP address can be used to compile a detailed picture of an individual's online activities, including: the online services for which an individual has registered; personal interests based on websites visited; organizational affiliations; where the individual has been physically; a person's political and religious affiliations; individuals with whom they have leanings and with whom they associate; and where they travel, among other things. *See* https://www.priv.gc.ca/en/opc-actions-and-decisions/research/explore-privacy-research/2013/ip_201305/ (last downloaded November 2023).

11.     For the preceding reasons, the ability to link an IP address to a particular individual is of great monetary value and has created an entire industry known as "identity resolution." Identity resolution is generally defined as "the ability to recognize an individual person, in real-time, by connecting various identifiers from their digital interactions across devices and touchpoints." *See* https://www.fullcontact.com/identity-resolution/ (last visited November 2023).

12.     The technical means by which an IP address is linked to a particular individual is via deployment of "pen register" software. Traditionally, law enforcement used "pen registers" in investigations to record all numbers called from a particular telephone, and "pen registers" required physical machines. Today, pen registers take the form of software. *See In re Order Authorizing Prospective & Continuous Release of Cell Site Location Recs.*, 31 F.Supp.3d 889, 898 n.46 (S.D. Tex. 2014) (citing Susan Freiwald, *Uncertain Privacy: Communication Attributes After the Digital Telephony Act*, 69 S. Cal. L. Rev. 949, 982-89 (1996) (describing the evolution of the pen register from mechanical device to computer code)).

13.     The following graphic shows how a website deploying pen register software to capture the IP address of visitors can identify anonymous website visitors and a great deal of personal information about their lives and habits:

14.     In the above example, a "pen register" has been used to capture an anonymous user's IP address and compare it to previously aggregated "touchpoints" to reveal the following details about a website visitor:

(a) Full name *(Mary Smith)*

(b) Date of birth *(May 1, 1979)*

(c) Gender *(female)*

(d) Home address *(2345 Avenue C, Papillion Nebraska)*

(e) Marital Status and Family *(Married with two children)*

(f) E-mail address *(Mary.Smith@gmail.com)*

(g) Personal Cell Phone: *(111) 123-4567*

(h) Voter Registration Status *(Registered)*

(i) Interests *(Shopping, Cooking, Traveling, Reading, Science)*

(j) Employer *(Karen's Fireside, Inc.)*

(k) Title *(Vice President)*

(l) Work Hours *(Daily 9-5)*

15.     Because of the massive privacy implications, California law prohibits the deployment of pen register software without first obtaining a court order. Cal. Penal Code § 638.51 ("CIPA Section

638.51"). CIPA defines a "pen register" broadly to include "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." *Id.* § 638.50(b). *See Greenley v. Kochava,* 2023 WL 4833466, at *15-*16 (S.D. Cal. July 27, 2023) ("the Court rejects the contention that a private company's surreptitiously embedded software installed in a telephone cannot constitute a "pen register."). CIPA imposes civil liability and statutory penalties for the installation of pen register software without a court order. *Id.*

16. Defendant knowingly and intentionally deployed "pen register" software on its website to decode routing, addressing, and signaling information to obtain the IP address of each visitor as part of Defendant's identity resolution efforts in violation of California law. In response to an appropriate request, Plaintiff will share with Defendant proof of the deployment and activity of the pen register.

17. Defendant used the pen register software to access Plaintiff's device and install tracking code on Plaintiff's device in violation of California law. *See Greenley v. Kochava,* 2023 WL 4833466, at *15-*16 (S.D. Cal. July 27, 2023). Defendant did not obtain Plaintiff's knowing and informed consent to do so, nor did Defendant obtain a court order authorizing it to do so.

## V.   CLASS ACTION ALLEGATIONS

18. Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class") defined as follows:

> **All persons within the state of California who visited Defendants website within the statute of limitations period and whose privacy was violated as described above.**

19. NUMEROSITY: Plaintiff does not know the number of Class Members but believes the number to be at least 100. The exact identities of Class Members may be ascertained by the records maintained by Defendant.

20. COMMONALITY: Common questions of fact and law exist as to all Class Members, and predominate over any questions affecting only individual members of the Class.

21. TYPICALITY: As a person who visited Defendant's Website and whose privacy was invaded, Plaintiff is asserting claims that are typical of the Class.

22.    ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of The Class. Plaintiff has retained attorneys experienced in class action litigation.  All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

23.    SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient.

## VI.    CAUSE OF ACTION

## CALIFORNIA INVASION OF PRIVACY ACT

## PENAL CODE SECTION 638.51

24.    Section 638.51 of the Penal Code provides that it is illegal to "install or use a pen register or a trap and trace device without first obtaining a court order pursuant to Section 638.52 or 638.53." (Penal Code § 638.51(a).)  A "'Pen register' means a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication.  (Penal Code § 638.50(b).)

25.    Defendant knowingly and criminally deployed pen register software to access Plaintiff's device, install tracking software, and obtain Plaintiff's IP address. *See Greenley v. Kochava*, 2023 WL 4833466, at *15-*16 (S.D. Cal. July 27, 2023) (Bashant, J.).  Plaintiff did not consent to Defendant's actions.

26.    Plaintiff suffered both an economic injury and an intangible injury to Plaintiff's dignity caused by the violation of Plaintiff's right to privacy.

27.    By knowingly violating a criminal statute and illegally accessing Plaintiff's device to install tracking software, Defendant acted with oppression and malice.  As such, Defendant is liable for punitive damages pursuant to Civil Code section 3294.

28.    Plaintiff is also entitled to statutory damages of $5,000. *See* Penal Code § 637.2(a)(1).

29.    The class members suffered the same intrusion and are entitled to the same damages as Plaintiff.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff seeks judgment against Defendant as follows:

a.      An order certifying the class and making appropriate case management orders therewith;

b.      For statutory damages, punitive damages, attorneys' fees; and

c.      For any and all other relief at law that may be appropriate.

Dated:  November 17, 2023            PACIFIC TRIAL ATTORNEYS, APC

By: _____

Scott. J. Ferrell
Attorneys for Plaintiff

CLASS ACTION COMPLAINT

# EXHIBIT 6

1    PACIFIC TRIAL ATTORNEYS
     A Professional Corporation
2    Scott J. Ferrell, Bar No. 202091
     sferrell@pacifictrialattorneys.com
3    4100 Newport Place Drive, Ste. 800
     Newport Beach, CA  92660
4    Tel: (949) 706-6464
     Fax: (949) 706-6469
5
     Attorneys for Plaintiff
6

Electronically FILED by
Superior Court of California,
County of Los Angeles
11/30/2023 11:18 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By S. Trinh, Deputy Clerk

7

8                    **SUPERIOR COURT FOR THE STATE OF CALIFORNIA**

9                             **COUNTY OF LOS ANGELES**

10

11   RUTH MARTIN, individually and on behalf of all      Case No. 23STCV29333
     others similarly situated,
12
                        Plaintiffs,                       **CLASS ACTION COMPLAINT FOR
13                                                        VIOLATION OF CALIFORNIA PENAL
                 v.                                       CODE SECTION 638.51**
14
     CHAR-BROIL LLC, a Georgia entity
15   d/b/a WWW.CHARBROIL.COM,

16                      Defendant.

17

18

19

20

21

22

23

24

25

26

27

28

## I.    **INTRODUCTION**

To learn the identity of visitors to www.charbroil.com (the "Website") and monetize its knowledge of those visitor and their online habits, Defendant has secretly deployed spyware that accesses visitor devices, installs tracking software, and tracks their browsing habits.

Plaintiff visited Defendant's website using a mobile device. Without Plaintiff's knowledge or consent, Defendant secretly accessed Plaintiff's device and installed "pen register" tracking software in violation of California law.

## II.    **JURISDICTION AND VENUE**

1. Defendant is subject to jurisdiction in this state under Penal Code section 502(j), which provides that a person who accesses a computer from another jurisdiction is deemed to have personally accessed the computer in California. Plaintiff was in California when Defendant accessed Plaintiff's device and installed tracking code.

2. Defendant is also subject to jurisdiction under California's "long-arm" statute found at California Code of Civil Procedure section 410.10 because the exercise of jurisdiction over Defendant is not "inconsistent with the Constitution of this state or the United States." Indeed, Plaintiff believes that Defendant generates a minimum of eight percent of revenues from its website based upon interactions with Californians (including instances in which the website operates as a "gateway" to sales), such that the website "is the equivalent of a physical store in California." Since this case involves illegal conduct emanating from Defendant's operation of its website targeting Californians, California courts can "properly exercise personal jurisdiction" over the Defendant in accordance with the Court of Appeal opinion in *Thurston v. Fairfield Collectibles of Georgia*, 53 Cal.App.5th 1231 (2020).

3. Venue is proper in this County because many class members reside in this County.

## III.    **PARTIES**

4. Plaintiff is a resident of California. Plaintiff is also a consumer privacy advocate who works as a "tester" to ensure that companies abide by the privacy obligations imposed by California law. As an individual who advances important public interests at the risk of vile personal attacks, Plaintiff should be "praised rather than vilified." *See Murray v. GMAC Mortgage Corp.*, 434 F.3d 948, 954 (7th Cir. 2006). Indeed, the Ninth Circuit recently made exceptionally clear that it is "necessary

1   and desirable for committed individuals to bring serial litigation" to enforce and advance consumer

2   protection statutes, and that Courts must not make any impermissible credibility or standing inferences

3   against them.  *Langer v. Kiser*, 57 F.4th 1085, 1095 (9th Cir. 2023).

4        5.    Defendant is a Georgia entity that sells barbecue supplies throughout the United States

5   and in this County.

6           **IV.    FACTUAL ALLEGATIONS**

7   **A.    The Right to Privacy Has Always Been a Legally Protected Interest in the United States.**

8        6.    Since America's founding, privacy has been a legally protected interest at the local, state,

9   and federal levels. *See Patel v. Facebook, Inc.*, 932 F.3d 1264, 1271–72 (9th Cir. 2019) (quoting *Spokeo,*

10  *Inc. v. Robins*, 578 U.S. 330, 341 (2016)) ("Privacy rights have long been regarded 'as providing a basis

11  for a lawsuit in English or American courts.'"); and *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th

12  Cir. 2017) ("Violations of the right to privacy have long been actionable at common law.").

13       7.    More specifically, privacy protections against the disclosure of personal information are

14  embedded in California statutes and at common law.  *See e.g.*, *U.S. Dep't of Justice v. Reporters Comm.*

15  *for Freedom of the Press*, 489 U.S. 749, 763 (1989) ("The Ninth Circuit has  repeatedly held that privacy

16  intrusions may constitute "concrete injury" for purposes of Article III standing); *Van Patten v. Vertical*

17  *Fitness Grp., LLC*, 847 F.3d 1037, 1041–43 (9th Cir. 2017) (finding "concrete injury" where plaintiffs

18  claimed that unsolicited telemarketing calls "invade the privacy and disturb the solitude of their

19  recipients*"); In re Facebook, Inc. Internet Tracking Litig*., 956 F.3d 589, 599 (9th Cir. 2020) (finding

20  "concrete injury" where Facebook allegedly tracked users' "personally identifiable browsing history"

21  on third party websites); *Patel*, 932 F.3d at 1275 (finding "concrete injury" where plaintiffs claimed

22  Facebook's facial-recognition technology violated users' privacy rights).

23       8.    In short, the  privacy of personal information is—and has always been—a legally

24  protected interest in many contexts. Thus, a defendant whose acts or practices violate consumer privacy

25  inflicts an actionable "injury" upon an individual.

26

27

28

CLASS ACTION COMPLAINT

**B.**     **Defendant Secretly Installs Tracking Software on the Devices of All Visitors To Its Website In Violation of California Law.**

9.      Every device connected to the internet has a unique IP address, typically consisting of a sequence of numbers. *See United States v. Caira*, 833 F.3d 803, 805 (7th Cir. 2016). An IP address "is used to route information between devices." *United States v. Ulbricht*, 858 F.3d 71, 84 (2d Cir. 2017).

10.     Once linked to a particular individual, a unique IP address can be used to compile a detailed picture of an individual's online activities, including: the online services for which an individual has registered; personal interests based on websites visited; organizational affiliations; where the individual has been physically; a person's political and religious affiliations; individuals with whom they have leanings and with whom they associate; and where they travel, among other things. *See* https://www.priv.gc.ca/en/opc-actions-and-decisions/research/explore-privacy-research/2013/ip_201305/   (last downloaded November 2023).

11.     For the preceding reasons and many others, the ability to link an IP address to a particular individual is of great monetary value and has created a cottage industry known as "identity resolution." Identity resolution is generally defined as "the ability to recognize an individual person, in real-time, by connecting various identifiers from their digital interactions across devices and touchpoints." *See* https://www.fullcontact.com/identity-resolution/ (last visited November 2023).

12.     The technical means by which an IP address is linked to a particular individual is via deployment of "pen register" software.  Traditionally, law enforcement used "pen registers" in investigations to record all numbers called from a particular telephone, and "pen registers" required physical machines. Today, pen registers take the form of software.  *See In re Order Authorizing Prospective & Continuous Release of Cell Site Location Recs.*, 31 F.Supp.3d 889, 898 n.46 (S.D. Tex. 2014) (citing Susan Freiwald, *Uncertain Privacy: Communication Attributes After the Digital Telephony Act*, 69 S. Cal. L. Rev. 949, 982-89 (1996) (describing the evolution of the pen register from mechanical device to computer code)).

13.     The following graphic shows how a website deploying pen register software to capture the IP address of visitors can identify anonymous website visitors and a great deal of personal information about their lives and habits:

14. In the above example, a "pen register" has been used to capture an anonymous user's IP address and compare it to previously aggregated "touchpoints" to reveal the following details about a website visitor:

(a) Full name (*Mary Smith*)

(b) Date of birth (*May 1, 1979*)

(c) Gender (*female*)

(d) Home address (*2345 Avenue C, Papillion Nebraska*)

(e) Marital Status and Family (*Married with two children*)

(f) E-mail address (Mary.Smith@gmail.com)

(g) Personal Cell Phone: (*111) 123-4567*

(h) Voter Registration Status (*Registered*)

(i) Interests (*Shopping, Cooking, Traveling, Reading, Science*)

(j) Employer (*Karen's Fireside, Inc.*)

(k) Title (*Vice President*)

(l) Work Hours (*Daily 9-5*)

15. Because of the massive privacy implications, California law prohibits the deployment of pen register software without first obtaining a court order. Cal. Penal Code § 638.51 ("CIPA Section

638.51").  CIPA defines a "pen register" broadly to include "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." *Id.* § 638.50(b).  *See Greenley v. Kochava*, 2023 WL 4833466, at *15-*16 (S.D. Cal. July 27, 2023).  CIPA imposes civil liability and statutory penalties for the installation of pen register software without a court order.  *Id.*

16.    Defendant knowingly and intentionally deployed "pen register" software on its website to decode routing, addressing, and signaling information to obtain the IP address of each visitor as part of Defendant's identity resolution efforts in violation of California law.  In response to an appropriate request, Plaintiff will share with Defendant proof of the deployment and activity of the pen register.

17.    Defendant used the pen register software to access Plaintiff's device and install tracking code on Plaintiff's device in violation of California law.  *See Greenley v. Kochava,* 2023 WL 4833466, at *15-*16 (S.D. Cal. July 27, 2023).  Defendant did not obtain Plaintiff's knowing and informed consent to do so, nor did Defendant obtain a court order authorizing it to do so.

## V.    CLASS ACTION ALLEGATIONS

18.    Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class") defined as follows:

> **All persons within the state of California who visited Defendants website within the statute of limitations period and whose privacy was violated as described above.**

19.    NUMEROSITY: Plaintiff does not know the number of Class Members but believes the number to be around 100.  The exact identities of Class Members may be ascertained by the records maintained by Defendant.

20.    COMMONALITY: Common questions of fact and law exist as to all Class Members, and predominate over any questions affecting only individual members of the Class.

21.    TYPICALITY: As a person who visited Defendant's Website and whose privacy was invaded, Plaintiff is asserting claims that are typical of the Class.

22.     ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of The Class. Plaintiff has retained attorneys experienced in class action litigation.  All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

23.     SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient.

### VI.     CAUSE OF ACTION

### CALIFORNIA INVASION OF PRIVACY ACT

### PENAL CODE SECTION 638.51

24.     Section 638.51 of the Penal Code provides that it is illegal to "install or use a pen register or a trap and trace device without first obtaining a court order pursuant to Section 638.52 or 638.53." (Penal Code § 638.51(a).)  A "'Pen register' means a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication.  (Penal Code § 638.50(b).)

25.     Defendant knowingly and criminally deployed pen register software to access Plaintiff's device, install tracking software, and obtain Plaintiff's IP address.  *See Greenley v. Kochava*, 2023 WL 4833466, at *15-*16 (S.D. Cal. July 27, 2023) (Bashant, J.).

26.     Plaintiff suffered both an economic injury and an intangible injury to Plaintiff's dignity caused by the violation of Plaintiff's right to privacy.

27.     By knowingly violating a criminal statute and illegally accessing Plaintiff's device to install tracking software, Defendant acted with oppression and malice.  As such, Defendant is liable for punitive damages pursuant to Civil Code section 3294.

28.     Plaintiff is also entitled to statutory damages of $5,000.  *See* Penal Code § 637.2(a)(1).

29.     The class members suffered the same intrusion and are entitled to the same damages.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks judgment against Defendant as follows:

a.     An order certifying the class and making appropriate case management orders therewith;

b. For statutory damages, punitive damages, attorneys' fees; and

c. For any and all other relief at law that may be appropriate.

Dated:  November 30, 2023

PACIFIC TRIAL ATTORNEYS, APC

By:_____

Scott. J. Ferrell
Attorneys for Plaintiff

# EXHIBIT 7

1   PACIFIC TRIAL ATTORNEYS
    A Professional Corporation
2   Scott J. Ferrell, Bar No. 202091
    sferrell@pacifictrialattorneys.com
3   4100 Newport Place Drive, Ste. 800
    Newport Beach, CA 92660
4   Tel: (949) 706-6464
    Fax: (949) 706-6469
5
    Attorneys for Plaintiff
6

Electronically FILED by
Superior Court of California,
County of Los Angeles
12/04/2023 12:00 AM
David W. Slayton,
Executive Officer/Clerk of Court,
By J. Covarrubias, Deputy Clerk

7

8                     **SUPERIOR COURT FOR THE STATE OF CALIFORNIA**

9                              **COUNTY OF LOS ANGELES**

10

11   MARIELITA PALACIOS, individually and on        Case No. 23STCV29586
     behalf of all others similarly situated,
12
                     Plaintiffs,                     **CLASS ACTION COMPLAINT FOR**
13                                                    **VIOLATION OF CALIFORNIA PENAL**
              v.                                      **CODE SECTION 638.51**
14
     WOLVERINE WORLD WIDE, INC., a Delaware
15   entity d/b/a WWW.ONLINESHOES.COM,

16                   Defendant.

17

18

19

20

21

22

23

24

25

26

27

28

## I.    **INTRODUCTION**

To learn the identity of visitors to www.onlineshoes.com (the "Website") and monetize knowledge of those visitor and their online habits, Defendant has secretly deployed spyware that accesses visitor devices, installs tracking software, and tracks their browsing habits.

Plaintiff visited Defendant's website using a mobile device. Without Plaintiff's knowledge or consent, Defendant secretly accessed Plaintiff's device and installed "pen register" and "trap and trace" tracking software in violation of California law.

## II.    **JURISDICTION AND VENUE**

1.    Defendant is subject to jurisdiction in this state under Penal Code section 502(j), which provides that a person who accesses a computer from another jurisdiction is deemed to have personally accessed the computer in California. Plaintiff was in California when Defendant accessed Plaintiff's device and installed tracking code.

2.    Defendant is also subject to jurisdiction under California's "long-arm" statute found at California Code of Civil Procedure section 410.10 because the exercise of jurisdiction over Defendant is not "inconsistent with the Constitution of this state or the United States." Indeed, Plaintiff believes that Defendant generates a minimum of eight percent of revenues from its website based upon interactions with Californians (including instances in which the website operates as a "gateway" to sales), such that the website "is the equivalent of a physical store in California." Since this case involves illegal conduct emanating from Defendant's operation of its website targeting Californians, California courts can "properly exercise personal jurisdiction" over the Defendant in accordance with the Court of Appeal opinion in *Thurston v. Fairfield Collectibles of Georgia*, 53 Cal.App.5th 1231 (2020).

3.    Venue is proper in this County because many class members reside in this County.

## III.    **PARTIES**

4.    Plaintiff is a resident of California. Plaintiff is also a consumer privacy advocate who works as a "tester" to ensure that companies abide by the privacy obligations imposed by California law. As an individual who advances important public interests at the risk of vile personal attacks, Plaintiff should be "praised rather than vilified." *See Murray v. GMAC Mortgage Corp.*, 434 F.3d 948, 954 (7th Cir. 2006). Indeed, the Ninth Circuit recently made exceptionally clear that it is "necessary

1  and desirable for committed individuals to bring serial litigation" to enforce and advance consumer

2  protection statutes, and that Courts must not make any impermissible credibility or standing inferences

3  against them. *Langer v. Kiser*, 57 F.4th 1085, 1095 (9th Cir. 2023).

4      5.    Defendant is a Michigan entity that sells shoes and related products from its website to

5  consumers throughout the United States and in this County.

6            **IV.   FACTUAL ALLEGATIONS**

7  **A.    The Right to Privacy Has Always Been a Legally Protected Interest in the United States.**

8      6.    Since America's founding, privacy has been a legally protected interest at the local, state,

9  and federal levels. *See Patel v. Facebook, Inc.*, 932 F.3d 1264, 1271–72 (9th Cir. 2019) (quoting *Spokeo,*

10  *Inc. v. Robins*, 578 U.S. 330, 341 (2016)) ("Privacy rights have long been regarded 'as providing a basis

11  for a lawsuit in English or American courts.'"); and *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th

12  Cir. 2017) ("Violations of the right to privacy have long been actionable at common law.").

13      7.    More specifically, privacy protections against the disclosure of personal information are

14  embedded in California statutes and at common law.  *See e.g.*, *U.S. Dep't of Justice v. Reporters Comm.*

15  *for Freedom of the Press*, 489 U.S. 749, 763 (1989) ("The Ninth Circuit has repeatedly held that privacy

16  intrusions may constitute "concrete injury" for purposes of Article III standing); *Van Patten v. Vertical*

17  *Fitness Grp., LLC*, 847 F.3d 1037, 1041–43 (9th Cir. 2017) (finding "concrete injury" where plaintiffs

18  claimed that unsolicited telemarketing calls "invade the privacy and disturb the solitude of their

19  recipients*"); In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 599 (9th Cir. 2020) (finding

20  "concrete injury" where Facebook allegedly tracked users' "personally identifiable browsing history"

21  on third party websites); *Patel*, 932 F.3d at 1275 (finding "concrete injury" where plaintiffs claimed

22  Facebook's facial-recognition technology violated users' privacy rights).

23      8.    In short, the privacy of personal information is—and has always been—a legally

24  protected interest in many contexts. Thus, a defendant whose acts or practices violate consumer privacy

25  inflicts an actionable "injury" upon an individual.

26

27

28

CLASS ACTION COMPLAINT

**B.      Defendant Secretly Installs Tracking Software on the Devices of All Visitors To Its Website In Violation of California Law.**

9.      Every device connected to the internet has a unique IP address, typically consisting of a sequence of numbers. *See United States v. Caira*, 833 F.3d 803, 805 (7th Cir. 2016). An IP address "is used to route information between devices." *United States v. Ulbricht*, 858 F.3d 71, 84 (2d Cir. 2017).

10.      Once linked to a particular individual, a unique IP address can be used to compile a detailed picture of an individual's online activities, including: the online services for which an individual has registered; personal interests based on websites visited; organizational affiliations; where the individual has been physically; a person's political and religious affiliations; individuals with whom they have leanings and with whom they associate; and where they travel, among other things. *See* https://www.priv.gc.ca/en/opc-actions-and-decisions/research/explore-privacy-research/2013/ip_201305/ (last downloaded November 2023).

11.      For the preceding reasons and many others, the ability to link an IP address to a particular individual is of great monetary value and has created a cottage industry known as "identity resolution." Identity resolution is generally defined as "the ability to recognize an individual person, in real-time, by connecting various identifiers from their digital interactions across devices and touchpoints." *See* https://www.fullcontact.com/identity-resolution/ (last visited November 2023).

12.      The technical means by which an IP address is linked to a particular individual is via deployment of "pen register" or "trap and trace" software. Traditionally, law enforcement used such devices in investigations to record all numbers called from a particular telephone, and they required physical machines. Today, pen registers and trap and trace devices take the form of software. *See In re Order Authorizing Prospective & Continuous Release of Cell Site Location Recs.*, 31 F.Supp.3d 889, 898 n.46 (S.D. Tex. 2014) (citing Susan Freiwald, *Uncertain Privacy: Communication Attributes After the Digital Telephony Act*, 69 S. Cal. L. Rev. 949, 982-89 (1996) (describing the evolution of the pen register from mechanical device to computer code)).

13.      The following graphic shows how a website deploying pen register and trap and trace software to capture the IP address of visitors can identify anonymous website visitors and a great deal of personal information about their lives and habits:

CLASS ACTION COMPLAINT

14.     In the above example, pen register and trap and trace software has been used to capture an anonymous user's IP address and compare it to previously aggregated "touchpoints" to reveal the following details about a website visitor:

(a) Full name *(Mary Smith)*

(b) Date of birth *(May 1, 1979)*

(c) Gender *(female)*

(d) Home address *(2345 Avenue C, Papillion Nebraska)*

(e) Marital Status and Family *(Married with two children)*

(f) E-mail address *(Mary.Smith@gmail.com)*

(g) Personal Cell Phone: *(111) 123-4567*

(h) Voter Registration Status *(Registered)*

(i) Interests *(Shopping, Cooking, Traveling, Reading, Science)*

(j) Employer *(Karen's Fireside, Inc.)*

(k) Title *(Vice President)*

(l) Work Hours *(Daily 9-5)*

15.     Because of the massive privacy implications, California law prohibits the deployment of pen register or trap and trace software without first obtaining a court order. Cal. Penal Code § 638.51

1   ("CIPA Section 638.51"). CIPA defines a "pen register" broadly to include "a device or process that

2   records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument

3   or facility from which a wire or electronic communication is transmitted, but not the contents of a

4   communication." *Id.* § 638.50(b). Cipa defines a "trap and trace" broadly to include any "device or

5   process that captures the incoming electronic or other impulses that identify the originating number or

6   other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a

7   wire or electronic communication, but not the contents of a communication."

8          16.    CIPA imposes civil liability and statutory penalties for the installation of pen register

9   software without a court order. *Id.; See also Greenley v. Kochava, 2023 WL 4833466, at \*15-\*16 (S.D.*

10  *Cal. July 27, 2023).*

11         17.    Defendant knowingly and intentionally deployed "pen register" and "trap and trace"

12  software on its website to decode routing, addressing, and signaling information to obtain the IP address

13  of each visitor as part of Defendant's identity resolution efforts in violation of California law.   In

14  response to an appropriate request, Plaintiff will share proof of the deployment and activity of the pen

15  register and trap and trace software.

16         18.    Defendant used the pen register and trap and trace software to access Plaintiff's device

17  and install tracking code on Plaintiff's device in violation of California law. *See Greenley v. Kochava,*

18  *2023 WL 4833466, at \*15-\*16 (S.D. Cal. July 27, 2023).* Defendant did not obtain Plaintiff's knowing

19  and informed consent to do so, nor did Defendant obtain a court order authorizing it to do so.

20                                     **V.    CLASS ACTION ALLEGATIONS**

21         19.    Plaintiff brings this action individually and on behalf of all others similarly situated (the

22  "Class") defined as follows:

23                 **All persons within the state of California who visited Defendants website**

24                 **within the statute of limitations period and whose privacy was violated as**

25                 **described above.**

26         20.    NUMEROSITY: Plaintiff does not know the number of Class Members but believes the

27  number to be around 100.  The exact identities of Class Members may be ascertained by the records

28  maintained by Defendant.

21.   COMMONALITY: Common questions of fact and law exist as to all Class Members, and predominate over any questions affecting only individual members of the Class.

22.   TYPICALITY: As a person who visited Defendant's Website and whose privacy was invaded, Plaintiff is asserting claims that are typical of the Class.

23.   ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of The Class. Plaintiff has retained attorneys experienced in class action litigation.  All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

24.   SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient.

## VI.   **CAUSE OF ACTION**

### **CALIFORNIA INVASION OF PRIVACY ACT**

### **PENAL CODE SECTION 638.51**

25.   Section 638.51 of the Penal Code provides that it is illegal to "install or use a pen register or a trap and trace device without first obtaining a court order pursuant to Section 638.52 or 638.53." (Penal Code § 638.51(a).)

26.   Defendant knowingly and criminally deployed pen register and trap and trace software to access Plaintiff's device, install tracking software, and obtain Plaintiff's IP address. *See Greenley v. Kochava*, 2023 WL 4833466, at *15-*16 (S.D. Cal. July 27, 2023) (Bashant, J.).

27.   Plaintiff suffered both an economic injury and an intangible injury to Plaintiff's dignity caused by the violation of Plaintiff's right to privacy.

28.   By knowingly violating a criminal statute and illegally accessing Plaintiff's device to install tracking software, Defendant acted with oppression and malice.  As such, Defendant is liable for punitive damages pursuant to Civil Code section 3294.

29.   Plaintiff is also entitled to statutory damages of $5,000. *See* Penal Code § 637.2(a)(1).

30.   The class members suffered the same intrusion and are entitled to the same damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff seeks judgment against Defendant as follows:

CLASS ACTION COMPLAINT

a.  An order certifying the class and making appropriate case management orders therewith;

b.  For statutory damages, punitive damages, attorneys' fees;

c.  An injunction to prohibit the unlawful conduct; and

d.  For any and all other relief at law that may be appropriate.

Dated: December 3, 2023

PACIFIC TRIAL ATTORNEYS, APC

By: _____

Scott. J. Ferrell
Attorneys for Plaintiff

- 8 -